Gabriel E. DAIGLE et al.

v.

CONTINENTAL OIL COMPANY and Continental Carbon Company.

Joseph T. SCOTT et al.

v.

CONTINENTAL OIL COMPANY and Continental Carbon Company.

Nos. 10524, 10840.

United States District Court
W. D. Louisiana,
Lake Charles Division.

May 29, 1967.

John B. Scofield, Lake Charles, La., Jeron J. LaFargue, Sulphur, La., for plaintiffs.

William R. Tete, Frank M. Brame, Lake Charles, La., for defendants.

EDWIN F. HUNTER, Jr., District Judge.

For a cause of action plaintiffs say that Continental Carbon and Continental Oil have respectively emitted carbon black and coke dust from their plants which have settled on their premises, possessions and bodies. Reserving all of their other claims for property damage, mental anguish, embarrassment and inconvenience, the plaintiffs by stipulation have expressly abandoned their claims for bodily injuries as such.

Produced by the defendants and offered in evidence was a large aerial photograph upon which was visible the plants of the defendants, the properties of the plaintiffs and other industrial facilities in the area; the plants of the defendants and plaintiffs' properties were located on this photograph during the trial.

All of the plaintiffs live in a small, common neighborhood; bounded on the north by the properties of plaintiff Patty Page Moss, which is located several hundred feet south of old U. S. Highway 90 (her properties consist of a residence, a rent house, a small structure housing a barbecue pit, a dance hall and a beer parlor); on the east by a heavily wooded strip of land which separates plaintiffs' properties from the plants of the defendants located immediately east of the wooded area; on the south by the heavily used railroad tracks of Kansas City Southern Railway Company and Southern Pacific Railway Company and a little further on the south by U. S. Interstate Highway I-10, and on the west by a sparsely wooded area and the R. E. Heidt Construction Company Asphalt Plant; most of the plaintiffs reside on Trousdale Road, an asphalt-surfaced road running north and south and connecting U. S. Interstate I-10 with old U. S. Highway 90; the remaining plaintiffs live on Sutherland Road, an east and west shell-surfaced road lying east of Trousdale Road and deadending at the heavily wooded area above-mentioned, and on Vaughn Road, an east and west shell-surfaced road lying west of Trousdale Road and deadending at or near the Heidt Asphalt Plant.

Plaintiffs' properties are located in the most highly industrialized area in southwest Louisiana; north and a little to the east of plaintiffs' properties and just north of old Highway 90 are two chemical plants; adjoining defendants' plants on the east is the multi-million dollar oil refinery of defendant Continental Oil Company which produces gasoline, other petroleum products and coke; south and perhaps a little to the east of plaintiffs' properties, and just south of U. S. Interstate I-10 is the Olin-Mathieson Chemical Corporation operation which produces among other things, caustic soda, flake caustic soda, soda ash, chlorine, ammonia, other prod-

ucts and waste products; immediately to the west of plaintiffs' properties is the Heidt Asphalt Plant; several miles to the southwest of plaintiffs' properties are located the refinery of the Cities Service Oil Corporation which manufactures gasoline, petroleum products and coke, the Firestone Tire and Rubber Company, which manufactures synthetic rubber, the W. R. Grace & Company, which manufactures various chemical products, and the Pittsburgh Plate Glass and Steel Company, which manufactures chlorine and other products. However, Continental Carbon Company is the only plant in Calcasieu Parish which manufactures carbon black, and Continental Oil Company is the only plant within 7½ miles that manufactures coke (Cities Service began producing raw coke during the year preceding the trial).

Until the late 1920's, the City of Lake Charles was a small town of some 15,000 people. In 1928, the deep channel to the Gulf of Mexico was opened; in 1934, Mathieson Alkali Works (the predecessor of the now giant Olin-Mathieson Chemical Corporation) built the first industrial plant in this area; Cities Service Refining Corporation built its one hundred million dollar refinery in the early 1940's, and has continuously since then expanded its operations; the other industrial plants above-mentioned have rapidly followed. Continental Oil Company's coking unit was placed in operation in the latter part of 1958; the Continental Carbon Company carbon black plant was placed in operation in 1952.

Plaintiffs are sincere, honest and hardworking people who strongly feel that defendants are interfering with their right to live on their property in comfort and cleanliness. They are not rich people. They are not influential people. They are not, for the most part, articulate people, but they know very definitely that a black smeary substance, at various intervals, causes them grave discomfort. The ladies complain about this much more than do the men, for it is they who mop the floors, scour the walls, wash the clothes, clean the furniture, etc.

As to the frequency, some plaintiffs testified it occurred every day; others said several times per month. The consensus seems to be that it occurs at somewhat irregular intervals, depending for the most part on the wind and the weather. There was concurrence that the trouble was worse when there was generally a wind from the east. The case was tried to the Court beginning on May 4th and lasted through June 18th. The Court made two visits to the area affected and announced at various' times that it was ready to make further inspection at any time during the trial that the plaintiffs' lawyers considered the situation to be typical, or to be aggravated. On my visits to the area I was unable to observe any grave condition. Plaintiffs' counsel suggests that with the Court's announcement of its availability to visit the premises at any time, defendants were more careful than usual. He puts it this way:

"* * * the evidence reveals that during the few months prior to the trial, and in fact, during the period from the time suit was filed until the date of the trial, the condition complained of was not as bad as it was before. This is easily explainable. Obviously, as soon as the suit was filed, the defendants were extremely careful and cautious in the operations of their respective plants. We would certainly do the same thing, if we were in their position. To do otherwise, would simply be stupid and we certainly are not making this accusation against the defendants."

The basic law of Louisiana on the subject matter is found under the heading "Of Servitudes Imposed By Law" in Chapter 3 of Title IV of the Louisiana Civil Code:

"Art. 666. Legal private servitudes

"Art. 666. The law imposes upon the proprietors various obligations towards one another, independent of all agreements; and those are the

obligations which are prescribed in the following articles."

"Art. 667. Limitations on use of property

"Art. 667. Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

"Art. 668. Inconvenience to neighbor

"Art. 668. Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.

"Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's (neighbor's) house, because this act occasions only an inconvenience, but not a real damage."

"Art. 669. Regulation of inconvenience

"Art. 669. If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place."

██ With the foregoing principles in mind, counsel for plaintiffs argue that the facts as disclosed by this record reveal that plaintiffs have been damaged within the meaning of Article 667. Counsel for defendants argue that circumstances here are such that Article 668 applies. The plaintiffs point out the Devoke case, Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816 and the

Bankston case, Bankston v. Farmers Cooperative Gin of Winnsboro, La.App., 116 So.2d 91. Defendants distinguish the facts here from those cases and insist that applicable under these circumstances are Lowther, et al. v. Southern Carbon, 163 La. 757, 112 So. 711, and O'Neal, et al. v. Southern Carbon, 216 La. 96, 43 So.2d 230. Plaintiffs, in their written arguments, predicate their cases entirely upon the provisions of Article 667 of the Louisiana Civil Code. Defendants assert that if this simplistic view of the law had been taken of the redactors of the Code, there literally would be no Lake Charles or Calcasieu Parish, Louisiana today, and adds that it is doubtful if the dubious blessings of civilization would have ascertained any appreciable distance from the Vieux Carre of New Orleans itself. Be this as it may, it is clear to us that when these two Articles of the Louisiana Civil Code (667 and 668) are considered in pari materia, it is obvious that the law makes the distinction between damages for which there is liability and inconvenience for which there is no liability. We believe that over the last six or seven years the circumstances here would sometimes be within the meaning of 668 and sometimes within the meaning of 667. As of the trial date and during the trial, the circumstances would require the application of 668 rather than 667. This is buttressed by the testimony to the effect that over the last six years the fallout has been cut by 75%, including a 20-25% reduction in June of 1965. However, the evidence, in our opinion, amply supports a finding that there were days when the black "stuff" came in sufficient degrees so that these good people sustained damage within the meaning of Article 667.

This problem of air pollution is the natural result of a modern, expansive industrial economy. But the concept is not new: [1]

"As soon as I had gotten out of the heavy air of Rome, and from the stink of the smoky chimneys thereof, which, being steered, poured forth whatever

1. See U.S. News & World Report, April 3, 1967, p. 45.

pestilent vapours and soot they held enclosed in them, I felt an alteration of my disposition." Rome, 61 A. D., Seneca.

"Eleanor of Aquitaine, Queen of England's Henry II, moved from Nottingham to Tutbury Castle to get away from what she called 'the unendurable smoke.' " Nottingham, 1257.

" * * * And what is all this, but the Hellish and dismal cloud of Sea-Coal, which is not only perpetually imminent * * * but so universally mixed with the otherwise wholesome and excellent air, that [London's] Inhabitants breathe nothing but impure and thick Mist, accompanied with a * * * filthy vapour, which renders them obnoxious to a thousand inconveniences, corrupting the Lungs, and disordering the entire habit of their Bodies; so that Cathorrs * * * Coughs and Consumptions, rage more in this one City, than in the whole Earth besides." London, 1661, John Evelyn.

In addition to what has heretofore been said as to the facts and law, we now set forth specific findings:

## FINDINGS OF FACT

1. This case, originally two separate actions, was removed here by defendants in September of 1964 and in February of 1965. The cases were consolidated and tried from May 3, 1966 to June 18, 1966.

2. Generally speaking, the homes of the plaintiffs lie immediately west of the plants of the defendants. The fallout has been, in past years, particularly bad when the wind blows from the east, but it is also noticeable when there is no wind at all. The amount of deposit varies depending on occasional failure of the plant operations which cause larger amounts to flow into the atmosphere. Mr. Thomas D. French was the plant manager at Continental Carbon Company's Westlake plant from 1961 to 1966. He agreed that a slight amount of carbon black is constantly emitted into the atmosphere from his plant. (Tr. 36–37).

3. Mr. James F. Bentley, Jr. is the Division Superintendent of the Coking Division of Continental Oil Company's Westlake Refinery. He stated that a small noticeable amount of fallout from his plant would settle on the claimants' homes over a period of about a week (Tr. 887). We find that both defendants continuously emit small amounts of coke or carbon black into the atmosphere.

■ 4. On this record, we find that the evidence fails to show damage within the meaning of Article 667 causally connected to the emissions from Continental Oil.

■ 5. We find that the evidence preponderates in favor of a finding that plaintiffs did sustain damage within the meaning of Article 667 and that this damage is traceable directly to the emissions from Continental Carbon (the "black stuff").

6. The only remaining question, and the heart of this case, is the extent to which the claimants were damaged.

7. Continental Oil Company's coking unit was placed in operation in 1958 and Continental Carbon Company's carbon black plant was placed in operation in 1952, but the damages were inconsequential prior to January 1, 1959. Some of the claimants owned property in this area before this time; others moved there subsequently. Some moved away and then, knowing of the condition, moved back into the area. The damage sustained by the claimants is not "unbearable" and neither is it a "mere inconvenience." The truth lies somewhere in between.

8. The substance was described in various ways depending on the individual concerned. The upshot seemed to be that there was both a black, smeary substance and gritty material. The substance floats through the air, settles on homes, gardens, automobiles and clothing. The homes which are cooled by window fans have considerably more inside damage than those which are airconditioned. The substance is hard to remove and gathers on the soles of one's shoes and is easily carried into the home.

9. A prudent housekeeper must do whatever is necessary to keep the home clean, inside and out. The emissions caused by Continental Carbon have made it more difficult to keep the homes and premises of plaintiffs clean. Carbon black, concededly, smears easily and coke dust is gritty to the touch. Concentrated detergents must be used to clean hard surfaces. Some items, particularly light-colored garments, are soiled permanently and must be replaced.

■ 10. It almost goes without saying that the claimants who owned homes near the plant property before operations were begun are entitled to a higher award for damages than those who bought in the area after the plants were put in production. Presumably, if the conditions are really as bad as alleged, surely the various purchasers were aware or should have been aware of the problem before making any sale agreement. The residential property values doubtless declined as a result of the obnoxious sooty substance which covered the premises. It seems only reasonable that the persons who moved into the neighborhood after operations began did so because of the lower relative cost of property there, and viewed in that light, they actually benefitted by defendants' operations. In any event, the latecomers surely knew or should have known that the condition existed when they moved there. The non-owners would, seemingly, be even less entitled to an award because since they are free to rent elsewhere, obviously the reason they remain is that the rent is lower there.

11. We are not unimpressed by the evidence that shows the high degree of efficiency of the defendants' operations. It is obvious, too, that the trouble and expense of further improvement of the systems will be considerable.

"There is much to be done. And we are losing ground. The air and water grow heavier with the debris of our spectacular civilization. The domain of nature shrinks before the demands of commerce.

"We can build, for a time, a rich nation surrounded and permeated by poisoned elements. By ignoring the poisons, or by treating them in a casual, piecemeal way, we can endure in their midst for decades.

"But here in America, we started out to do more than simply endure. We intended to live as men should live, working hard, raising families, learning, building—and breathing clean air, swimming in clear streams, finding a part of the forest or the shore where nobody else was.

"If we are to have this America, we shall have to master the consequences of our own prosperity—and the time to begin is now."
 Lyndon B. Johnson
 The White House, January 30, 1967

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the matter under its diversity of citizenship jurisdiction. As alleged in the petitions for removal, the defendants, Continental Oil Company and Continental Carbon Company, are non-resident corporations organized and existing under and by virtue of the laws of the State of Delaware. The plaintiffs are all citizens and residents of the State of Louisiana and the amount in controversy exceeds $10,000.

■ 2. In this diversity action the Court is controlled by the law of the State of Louisiana.

3. Defendants' pleas of prescription are predicated on the theory that the emissions were not constant but that they were sporadic. We have dealt with this question separately.

■■ 4. The owner of property has the largest liberty possible, in the use, occupation and improvement of his own property, consistent with the right to employ modern methods and machinery, but one may not use his property or permit it to be used to the injury of any legal right of another. Negligence or fault is not a requisite to liability under Article 667 of the Louisiana Civil Code. This is true, irrespective of the fact that the activities resulting in damages are conduct-

ed with reasonable care and in accordance with modern and accepted methods. (La. Civil Code Articles 666, 667, 668, 669; Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816; Fontenot v. Magnolia Petroleum Company, 227 La. 866, 80 So.2d 845.

5. Defendant Continental Oil Company owns the premises on which is located the carbon black plant of Continental Carbon Company, its lessee. As owner, Continental Oil is responsible to claimants for the damage caused by the Carbon Company plant. The owner cannot escape responsibility for activities conducted on his premises by his lessee when those actions damage neighboring property owners, because the duty owed to the neighbor is non-delegable. Hauck v. Brunet, La.App., 50 So.2d 495.

6. Subsequent to the briefing of this case, a Louisiana Court of Appeals decided the case of Burke v. Besthoff Realty Company, 196 So.2d 293. That decision interprets the word "proprietor" to encompass only the owner of the land. If *Burke* is followed here, it would mean that the Carbon Company (the tenant) whose emissions caused the damage is not liable. We feel that "proprietor" should certainly encompass the operator of the business on the premises, but feel judicially compelled for the time being, at least, to declare *Burke* to be the present law of Louisiana. If any party desires a rehearing on this specific issue, it will be granted and arguments will be heard. My impression is implicit that counsel for all tried this case believing that the word "proprietor" surely included a company operating the business which caused the damage. The Court has always thought that this was the law.

## DAMAGES

We shall make an award on more or less a household basis allowing adjustments for latecomers and non-owners:

A. Sixty ($60) Dollars per month per household[2] to all property owners

who acquired their property prior to January 1, 1959.

B. Thirty ($30) Dollars per month per household will be awarded to all property owners who acquired their property subsequent to January 1, 1959.

C. A flat $250 is awarded to all adult non-owner claimants. This represents the estimated costs of moving to a similar location near the city where there will be no burdensome "black stuff."

D. Claimants in Civil Action No. 10,524, who were parties to a settlement agreement through November 30, 1961 are to recover damage measured from that date.

E. Other plaintiffs are to recover damage measured from the date each acquired the property, or from January 1, 1959, whichever is the nearer to this day.

F. All damages shall be measured from stated dates until date of April 30, 1966. The January 10, 1959 date has been selected because the Court's findings on this record that damages prior to that date were inconsequential. The date of April 30, 1966 is chosen because the court finds that on this record there was no damage subsequent to that date.

Judgment is against Continental Oil Company only.

Counsel for plaintiffs will prepare and submit a decree setting forth specific awards in dollars and cents. A separate decree should be presented in each case.

## THE REQUEST FOR INJUNCTION AND THE PLEA OF PRESCRIPTION

Plaintiffs request injunctive relief. Courts of equity exercise discretionary power in the granting or withholding of such relief. The power to grant should be exercised only when in-

---

2. This means, for example, that Mr. and Mrs. Luke Lavergne are to recover (together, for everything) $60 a month from November 30, 1961 until April 30, 1966— or a total of 4 years and 5 months—$3,180.

tervention is essential to protect against irreparable injury. An injunction in this case would bear heavily on defendants and the public without benefitting the plaintiffs, because substantial redress can be afforded by the payment of money. Besides, these defendants have shown that the design and operation of their plants are in accordance with the highest standards and practices of the industry, and that their operations have been brought to this high state of efficiency as a result of the expenditure of great sums of money to improve upon their original design which admittedly was less efficient in suppressing the emission of coke than they are now. The processes they now use are in advance of those of similar plants in the industry and they are making extraordinary efforts to maintain this position and to cooperate with other industries on an area-wide basis in seeking solutions to problems of air pollution. The request for injunctive relief is denied.

■ Continental Carbon has filed a plea of prescription of one year. If this plea were sustained, the plaintiffs would be barred from claiming any damages as a result of Continental Carbon's activities prior to one year before the date they filed their respective actions. Louisiana Civil Code Article 3536 states that actions for damages caused or resulting from quasi-offenses are prescribed in one year; Louisiana Civil Code Article 3537 states that where land, timber or property has been damaged by a quasi-offense, the one year prescriptive period commences on the date that knowledge of such damage is received by the owner thereof. Counsel for Continental Carbon is not without authority in support of his position. Gulf Insurance Company v. Employers Liability Assurance Corp., Ltd., La.App., 170 So.2d 125; Spyker v. International Paper Co., 173 La. 580, 138 So. 109; Rhodes v. International Paper Co., 174 La. 49, 51, 139 So. 755; Young v. International Paper Co., 179 La. 803, 155 So. 231. However, the Louisiana Supreme Court, in Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816, has held that a plea of prescription is without merit, where, as here, the operating cause of the injury is a continuous one, giving rights to successive damages from day to day. The question of whether or not prescription applies really depends on whether or not the injury is a continuous one. The question is a serious one. It presents a close question. This is so, because the consequential damages here did occur at irregular intervals, and it might well be argued that though there might be an infinitesimal amount of carbon black emitted into the air daily, the daily emissions are so inconsequential that they could not be classified as damage under Article 667. However, after careful consideration, we do think that in applying the facts of this case to *Devoke*, the plea of prescription should be denied. It is true that there were no serious emissions from May 4th through June 18, 1966, when this case was being tried. The Court made several visits to the premises and informed counsel that is was available at any time. We found no Article 667 damage on those occasions. It would therefore be our thought that the amount of carbon black emitted into the air during this period of time would be more in the nature of those damages which, instead of being substantial or consequential, are remote, and therefore "damna absque injuria" within the meaning and contemplation of the Louisiana Law (Article 668). What we are saying is that ȯn *this record* the discontinuance of any serious emissions during this period might well serve to interrupt the continuity of the injury so that a plea of prescription in a subsequent case might be valid. However, as to these cases which were filed prior to these dates, the plea should be denied. It is.

## ON POST-JUDGMENT MOTIONS

Both defendants, as well as plaintiffs, have filed post-judgment motions. This Court, under date of May 29, 1967, made detailed written findings of fact and conclusions of law. We renew and adopt again each finding of fact. However, upon reflection and study, we are persuaded

that the judgment should be amended so that both defendants be liable in solido. It is therefore necessary that we amend Conclusion of Law No. 6.

Previously, we stated that the lessee, Continental Carbon Company, was not liable for damages to plaintiffs, but that the fee owner of the land in question, Continental Oil Company, was solely liable. [The codal article provides that "a Proprietor" may not make any work on his "estate" which may be the cause of damage to his neighbor]. Essentially, the question is one of textual interpretation—does "proprietor" encompass tenant, fee owner, or both? The conclusion that in a case between plaintiffs and tenant and fee owner only the fee owner is liable seemed compelled by Burke v. Besthoff Realty Company, Inc., et al., 196 So. 2d 293, decided in the Fourth Circuit Court of Appeals for Louisiana (1967).

That case involved damages done to a neighboring house by the vibrations from trash collection operations on Besthoff's land. The operations were contracted for by Katz & Besthoff, Besthoff's lessee. The Fourth Circuit held that "proprietor" meant "owner", and that under LSA–C.C. Art. 667 the lessee was not liable in solido with the owner. The Fourth Circuit distinguished cases in which lessees had also been held liable under 667 by finding that "in those cases * * * there was an element of fault on the part of the lessee, as in Muller v. Stone, 27 La.Ann. 123 (1875)," or that a long term lease was involved, as in McGee v. Yazoo M. V. R. Co., 206 La. 121, 19 So.2d 21 (1944). Like the thirteenth stroke of a crazy clock, the former distinction especially is incredible, because in Burke, there was indeed fault on the part of the lessee. It hired the offensive, vibrating, trash-collecting truck, and it refused to respond to plaintiff's complaints about the ensuing damage. So by the Fourth Circuit's own reasoning the lessee should have been held liable. Burke is unlikely to reach the Louisiana Supreme Court, as fee owner (Besthoff Realty) and lessee (Katz & Besthoff) were owned by the same interests.

Therefore, as a practical matter it made no difference which defendant was held liable, or if both were.

 But, were the present case before the Supreme Court of Louisiana, it is unlikely that Burke would be followed. In finding a state's law, we are not to follow mechanically the most recent available statement of an intermediate court but rather must determine, on consideration of all relevant factors, how the highest court of the state would decide the question. Legget v. Comm. of Internal Revenue, 2 Cir., 329 F.2d 509 (1964). The Erie doctrine does not compel blind obedience to a case decided by an intermediate state court and apparently deviating from the established mainstream of the state's jurisprudence. Shelp v. National Surety Corp., La., 333 F.2d 431 (1964).

 We conclude that Continental Oil and Continental Carbon are liable in solido. The test of the Louisiana Civil Code itself clearly compels this result. Who is the "proprietor" of an estate? At common law, an estate can mean almost any interest in land—a fee simple, a leasehold, a life estate, an estate pour autre vie. At civil law in Louisiana, Article 448 provides that "the word estate in general is applicable to anything of which riches or fortune may consist." Obviously, both defendants had estates in this property. Continental Oil had the fee ownership; Continental Carbon, the tenant, held an incorporeal immovable estate—a leasehold. The estate was incorporeal in that it consisted of a right not of absolute possession. So, at civil law, as at common law, varieties of estates can be held simultaneously on the same land. In the present case, two estates are involved and two proprietors are involved—the two defendants.

## CONCLUSION

All pending motions are denied with the exception heretofore noted. Accordingly, counsel for plaintiffs should submit an amended judgment holding defendants liable in solido.