284 So.2d 905 (1973)
Victor A. LOMBARD
v.
SEWERAGE AND WATER BOARD OF NEW ORLEANS et al. and consolidated cases.
No. 53006.
Supreme Court of Louisiana.
October 29, 1973.
Rehearings Denied November 30, 1973.
*906 Harry P. Gamble, Jr., Harry P. Gamble, III, Cameron C. Gamble, Gamble & Gamble, New Orleans, for plaintiffs-applicants.
John A. Gordon, Sp. Counsel, Sewerage and Water Bd. of New Orleans, Vincent T. LoCoco, Richard M. Olsen, Associate *907 Counsel, Ernest A. Carrere, Jr., Patrick W. Browne, Jr., Donald O. Collins, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-respondents.
SUMMERS, Justice.
Seventeen consolidated suits involving 119 plaintiffs are presented for review on certiorari. Plaintiffs are seeking awards for damages claimed to have resulted to their residences, a church, school buildings and a combination radio repair shop and dwelling. The damages are alleged to have been caused by activities in connection with a canal construction project on Louisa Street in the city of New Orleans. The city of New Orleans, the Sewerage and Water Board of New Orleans, Boh Brothers Construction Co., Inc., and their insurer Travelers Insurance Company are named defendants.

The Facts
Louisa Street was chosen by the Sewerage and Water Board as the site for the construction of an underground drainage canal extending from Florida Avenue to North Claiborne Avenue. The location was selected as the most feasible for draining a considerable area on all sides of Louisa Street where flooding had presented problems in the past. Boh Brothers was the successful bidder for the job, and the contract was awarded on November 14, 1962, and approved by the City Council.
Louisa Street is a relatively narrow (40.98 feet) street in a heavily populated area with small, modest, closely spaced, substandard residences located near the street. The plans called for a canal 14 feet wide with one-foot six-inch-side walls and a 2-foot pay slope on either side, or a total of twenty-one feet.
Work began on December 4, 1962 with the removal of existing sewerage and water lines from the center of Louisa Street and the excavation and laying of replacement lines on the sidewalk rights of way on both sides of Louisa Street. Laying of the replacement sewer lines required a ditch, 5 to 12 feet deep, within a few feet of adjacent buildings. Another such ditch parallel to and near the first was required for the water lines. These excavations were accomplished with a "back hoe", a heavy, tractor-like machine equipped with a mechanical arm or beam and bucket for digging. At least in some instances, these ditches were not braced, and the loose excavated soil was used for backfilling without compaction. Wood bracing used to retain the ditch bank was buried with the backfill. Water mains were laid in shallow trenches, and no bracing was used.
Thereafter, construction of the canal began following a fixed sequence. First, interlocking, one-half inch sheet piling was driven along the periphery of the intended excavation. The wall or bulkhead formed by this 25-foot sheet piling was expected to retain the mud bank on either side of the excavation between them. Round, wood, supporting piling was then driven within the parallel lines delineated by the sheet piling. Installation of the wood piling was designed to provide support for the concrete barrel of the canal to be superimposed on them. All piling was driven with a steam hammer mounted on a skid and rollers. They were driven to the desired depth below the surface with a punch.
When a segment of sheet piling was downsegments being variously shown by the record to be from 25 to 100 lineal feet in length along both sides of the canal routeand driving of the support piling was completed, excavation began. A large dragline was employed for this purpose. After excavating to a depth of 3 or 4 feet, a line of large, heavy 12" × 12" timbers (wales) were placed against the sheet piling parallel to, and about two feet below, the street surface. Screw jacks on the ends of poles extending from one side of the excavation to the other were tightened to exert pressure on the wales and to hold them snug against the sheet piling, preventing *908 movement inward. Thus the bank of the excavation was not permitted to give into the excavated trench.
Excavation then proceeded to the bottom of the proposed canal. The round, wood piling was cut to the proper level and clam shells were used to cover the bottom. Forms were then installed and quick drying concrete was poured. This operation generally took place 125 to 150 feet behind the pile-driving and on the same day excavation began. The next morning bottom braces, made of round piling cut to size, were installed from each side of the canal bottom to the sheet piling as additional bracing.
Backfilling then commenced. A select backfill of river sugar sand, specified and used exclusively on the job, was deposited in the trenches from heavy trucks in layers on either side of the concrete canal. Water was then jetted over the sand to fill voids, and give the maximum cohesiveness and compaction to improve setting. The sheet piling was removed vertically during backfilling with special machines designed by the contractor. The sheets were then transported in trucks along the line to be used again.
At all times during construction, lasting more than one year, the job was adequately supervised and carried on by competent workmen in a workmanlike manner. In March 1964 the work was accepted as completed by the Sewerage and Water Board.
In the voluminous testimony taken at the trial, according to defendants' evidence, no negligence on the part of the contractor, the Sewerage and Water Board or the City was established. The methods and procedure employed were approved as reasonable and acceptable for that type construction by the experts called to testify. It is a tribute to the industry, experience and competence of defendants that such a project, beset by the unique soil and water conditions prevailing in the city of New Orleans, could be accomplished in such a manner as to meet acceptable standards of reasonableness and workmanlike performance.
Notwithstanding the many precautions taken, however, and the skill displayed by the contractor, it is relatively impossible to accomplish this type work in a perfect manner. Consequently there were numerous complaints by the owners and occupants of the buildings along the construction route.
A careful and accurate review of the evidence bearing upon the alleged negligence of defendants was made by the commissioner appointed by the trial judge and by the Court of Appeal. Each correctly concluded that no negligence was established on the part of defendants. However, no adequate review of plaintiff's evidence on the issue of causation appears from these findings. Especially is this true in regard to the testimony of the individual plaintiffs which these courts found to be "uncorroborated" and "insufficient". Thus, according to the findings of these courts, plaintiffs' contentions that the construction activity caused damage to their property does not appear to be supported by the facts. For these reasons it is necessary to review the evidence they offered.
Earl Jupiter is a plaintiff who owns a concrete block residence at 2510 Louisa Street. He testified that before the construction activity began his house was in "perfect condition". Because of the pile-driving and excavation, the level of his house was "dislocated"; the doors would no longer close; and the porch moved away from the structure. While the pile-driving was in progress, the house would shake, window panes and walls cracked, the toilet pipes parted and the toilet moved away from the bathroom wall. Later, when soil subsidence occurred, the concrete driveway on his lot cracked.
Eugene Scott's house is six blocks away on the corner of Louisa and Law Streets. Several years prior to the construction he contracted for a concrete chain wall foundation for his house. While the pile-driving *909 operation was being conducted, he noticed that cracks became larger in the plaster of several rooms, some falling from the walls. The large bucket of the dragline also caused serious vibrations when it dropped to the ground. After the canal was completed and the excavations filled in, he noticed a gradual subsidence of the soil, cracks in concrete walks, doors and windows jamming, cracks in sheetrock, and a lean toward Louisa Street of the soil surface and his house, fence and walkway. Five years later at the time of the trial, this subsidence was still in progress to some extent. He attributes the subsidence to pulling the sheet piling too soon, before the land settled. He complained to Boh Brothers who sent someone to examine the property and take his statement.
At the time of the construction, Joseph Sorbet's house was ten years old and in good condition. It is a two-story frame structure set back fifteen feet from the front property line. The house rests on a reinforced concrete chain foundation, with a concrete footing. The inside walls are sheetrock. According to his testimony, the construction activity causing most vibration was the pile-driving and dropping the dragline bucket. While standing on the walkway in front of his house, talking to one of the guards on the construction job, during the dragline operation, they saw the concrete crack in the walkway.
In addition, the inside sheetrock and the outside precast concrete steps to his house cracked. Some of the back filling was not well done, he noticed, and large holes four or five feet deep formed in front of his house due to settling. These holes remained unfilled for about two weeks. He made verbal complaint to the person he assumed to be superintendent on the job. He was advised to notify Travelers Insurance Company, Boh Brothers' insurers, which he did. Traveler's agent took his statement.
According to Mrs. Clarence Brakewell, her house at 1635 Louisa Street was in "very good condition" before the construction work began in November 1962. The house sits back seven and one-half feet from the front property line. Cracks in the plaster, bad door alignment and "rumblings" which shook the walls resulted from the pile-driving. The ditch for the sewerage line was about ten feet deep in front of her house. Later, after the canal was excavated and settlement had begun, her house shifted, the floor molding separated from the wall and the front porch separated from the house. Door locks had to be realigned on her garage situated at the front of her house. She complained to Boh Brothers.
Mrs. Abbie Gaupp's residence is at 1614 Louisa Street. The house is built close to the front property line. The back hoe digging the twelve-foot ditch for the water and sewerage line struck the side of her house and crushed the steps. When the pile driver began its operation in front of her house, it shook the china on the shelves, and cracks appeared in the walls. All mirrors and other objects hanging on walls had to be removed. Since then the gate in front of her house can no longer be opened inward as formerly. The fence also leans now. She wrote a letter complaining and an appraiser came and surveyed the damage. Prior to this, someone had been sent to take pictures of the damage. She also testified to the cave-ins after the backfill operation.
During 1962 and 1963 Henry O'Brien, Jr., lived at 2005 Louisa Street. He is a city fireman. He owned his five-room wood frame dwelling; at the time he had lived there eleven years. Describing the effect on his house of the pile-driving, he said, "Everything in the house shook. . . They were knocking the dishes off the table and stuff like that." The baseboards in the two front rooms pulled away from the wall, leaving large cracks. Sheetrock joints on walls and ceilings pulled apart. The concrete porch gradually moved away from the house. His house is about three feet from the public sidewalk. *910 He and the whole neighborhood complained to the men on the job. The foreman on the job for Boh Brothers tried to convince the residents not to worry about any damage that was done, for, he assured them, Boh Brothers would take care of it as soon as it was over.
Bennie A. Lions lives in a wood house at 1637 Louisa Street. The house, which he owns, was built in 1947. In his house the sheetrock bellied down and cracked as the pile-driving went on. A 30' × 30' cement floor in a rear shed also cracked. Verbal complaints were lodged with the employees on the job.
A combination radio and television repair shop and dwelling belonging to Henry Milburn is located at 2651 Louisa Street. The pile-driving operation caused thin cracks to form in the walls and ceilings. Then, on March 12, 1963, as a piling was being hoisted, it got loose and dropped on the shop, breaking the rafters, cracking the concrete block wall and damaging the roof. A crack also appeared in the concrete floor. His building, too, leaned toward Louisa Street after the sheet piling was removed. Though the front shop of the building had a concrete slab floor on the ground, the rear part of the building was elevated on concrete piers. Toward the end of 1963, he noticed a pipe had been leaking for some time under the elevated part of the building, a leak he attributed to construction vibrations. In time the plaster fell from the ceiling to such an extent that the entire ceiling had to be covered with sheetrock.
Complaints to the job foreman brought assurances that the insurance would "cover anything". Also the entire concrete block front of the building had to be replaced because of the lean and the cracks caused by the construction.
Several times during the pile-driving operation Nevelin Wilson of 1905-07 Louisa Street complained to Boh Brothers about vibrations shaking his house and disturbing his wife who had just returned from the hospital. These vibrations also caused the porch to leave the sills. It was Wilson's further observation that trucks traveling on either side of the canal on plank runways in close proximity to his house also caused considerable vibration.
Warren Llado was principal of the Johnson-Lockett Elementary School in 1963. This school consisted of three sets of buildings occupying a square facing Louisa Street. Llado noticed damage to the buildings nearest Louisa Street during and after the construction work; he noted, for example, such things as separation between the outside walls and inner walls, and steps jarred loose from the principal structure. He noticed that after the construction water accumulated and would not drain off areas where drainage had previously been no problem. The school's custodian, Tevis Vandergriff, confirmed that there were no cracks in the buildings before construction. He testified damage to the buildings began during construction, and subsidence occurring later caused cracks to widen. Some of the damage was repaired by the contractor.
B. M. Dornblatt, a consulting engineer, also testified as an expert witness for the School Board plaintiff. Damage to the school buildings mentioned by the principal and custodian was confirmed by him. On different inspections, several months apart, he observed and measured the widening of cracks and subsidence of walls and other parts of the structures. In his opinion the subsidence and resulting damage was due to the leeching of fines (flow of sand particles) through the sheet piling bulkhead; principally, he felt that the pulling of the sheet piling allowed soil movement. He noticed a considerable settling of the backfill due to the fact there was no thorough compaction. In his opinion, the lowering of the subsurface water table, which occurred during and following the construction, was due to the excavation. This lowered water table also contributed substantially to the subsidence in the area.
*911 Godfrey M. Soniat is in the real estate and insurance business and manages three dwelling houses on the twenty-four hundred block of Louisa Street. As a result of the work being carried on on Louisa Street, he observed the following effects upon those houses: front porch pulled away from house; door frames twisted permitting only partial opening of doors; cracks in cement block building; windows not closing properly; front wall pulled out; paneling in kitchen pulled out on one side; concrete slab in driveway cracked badly. These damages, he testified, did not exist before construction.
C. Henry Flower, architect called by plaintiffs, made inspections of 100 houses after completion of the construction to determine if damage had been caused by settlement. As a result of the inspection, he found a great deal of damage to many houses. Settlement caused such things as porches to pull away from the house, cracks in the walls, cracks in piers, and cracking of windows and doors. The general pattern of settlement was toward Louisa Street. More houses were damaged on Louisa Street than on other streets of the neighborhood. He acknowledged, however, that most of the houses were poorly built, and, on cross-examination, conceded that piling would have provided a proper foundation for these houses, and, presumably, prevented much of the damage.
Civil Engineer William H. Butts also testified as an expert for plaintiffs. He had considerable experience with soil studies, compaction, stability, culvert construction and related problems. In his opinion soil failure (movement which causes damage) could occur over a period of time. In this area the soil was not strong or stable, consisting mostly of a soft clay. Pile-driving operation in this type soil would ordinarily not cause excessive vibration, unless obstructions were encountered. Some vibrations, of course, would occur under normal conditions.
In his opinion the soil mass in the vicinity of an excavation becomes unbalanced, tending to cause soil failure, a combination of lateral and vertical movement. The condition is exaggerated where building weight is added to the soil mass. If not counterbalanced by proper bracing, an incipient failure would occur. From a study of data on the construction job, he concluded there was soil movement over a period of time in the vicinity of the project site. A check of a few buildings on Louisa Street convinced him that he could not determine when the damage occurred.
Plaintiffs' claims that the damage occurred as a result of the construction are corroborated by the nonlitigants: Llado, principal of the Johnson-Lockett school; Vandergriff, the custodian; Soniat, the real estate and insurance agent managing some of the property on Louisa Street; and plaintiffs' expert witnesses Flower, Butts and Dornblatt.
In addition, George D. Montgomery, chief resident engineer, and Edmund F. Hughes, civil engineer, both with the Sewerage and Water Board, confirmed that complaints were received from the property owners on and near Louisa Street. Robert H. Boh, contractor, spoke of "inevitable vibrations that accompany the equipment that is used." Walter Blessey, who testified as an expert engineer for defendants, said, "There is no way you can put a structure like this into the ground without having some movement." When questioned about the cause of damage, he said, "I am not saying the construction operation could not have caused it." Albert Saucier, Jr., who was then an employee of the Sewerage and Water Board as an engineering inspector, submitted a report dated April 1, 1963 showing that cracks in the building at 2632 Louisa Street were wider than they had been the day before. At that time pile-driving was in progress immediately adjacent to the site. Robert Lambert, job superintendent for the contractor, answered a complaint and observed what appeared to be old cracks which were "separating" in one building. He thought it could have been from the vibrations.
*912 It is significant to note, also, that no reference is made in the findings of either court below relating to the small trenches excavated for the sewerage and water lines. Undoubtedly this work did play some part in the damage complained of. Important, too, is the fact that the credibility of the plaintiffs has not been attacked or impugned in any manner.
Although only eight of the 119 plaintiffs testified, a stipulation in the record sets forth that if each plaintiff in all cases was called to the stand, "He would testify substantially as those plaintiffs have testified who have taken the stand as to causation and damages to the property of each plaintiff." Under these circumstances 119 plaintiffs corroborated one another. It is inconceivable to this Court that the testimony of these many plaintiffs can be disregarded as not credible.

The Law
The central issue in this case is causation that is, whether the damage claimed by these plaintiffs was caused by the activity of the contractor on this construction project. For if causation and damage are established, defendants must be held responsible under principles announced in Article 667 of the Civil Code. That article reads:
Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
In Chaney v. Travelers Insurance Co., 259 La. 1, 249 So.2d 181 (1971), we recognized the rule to be applied to these cases, as follows:
Article 667 is therefore a limitation the law imposes upon the rights of proprietors in the use of their property. It is a species of legal servitude in favor of neighboring property, an expression of the principle of sic utere. An activity, then, which causes damage to a neighbor's property obliges the actor to repair the damage, even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on which is significant; it is the fact that the activity causes damage to a neighbor which is relevant. This being ascertained, it remains only to calculate the damage which ensued.
And the proprietor is likewise responsible not only for his own activity, but also for that carried on by his agents, contractors and representatives with his consent and permission. This liability which the law imposes attaches also to the agent or contractor, who, as in this case, becomes solidarily liable with the proprietor if his activity causes damage to a neighbor.
The Chaney Case was no innovation in the law. See Yiannopoulos, Property, Legal Servitudes; Sic Utere, 32 La.L.Rev. 183 (1972). Though not brought to our attention at the time, the rule of the Chaney Case had been well stated in Daigle v. Continental Oil Co., 277 F.Supp. 875 (W. D.La.1967), in these words:
The owner of property has the largest liberty possible, in the use, occupation and improvement of his own property, consistent with the right to employ modern methods and machinery, but one may not use his property or permit it to be used to the injury of any legal right of another. Negligence or fault is not a requisite to liability under Article 667 of the Louisiana Civil Code. This is true, irrespective of the fact that the activities resulting in damages are conducted with reasonable care and in accordance with modern and accepted methods.
In deciding a claim under Article 667 for damage to houses arising out of vibration and shock caused by geophysical operations on adjoining property, this Court in Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955), said:
It has been universally recognized that when, as here, the defendant, though *913 without fault, is engaged in a lawful business, conducted according to modern and approved methods and with reasonable care, by such activities causes risk or peril to others, the doctrine of absolute liability is clearly applicable. There can be no legal justification for relieving it of liability and thereby deny compensatory damages to one having no relation to the conducting of such business and thus compel him to bear the unwarranted loss.
Causation is the first problem to be resolved from the facts we have found under the principle announced in these cases. The question is central, for without establishing that the damage was caused by defendants these plaintiffs cannot recover. The burden of proof quite properly must be met by plaintiffs.
To be actionable the cause need not be the sole cause, but it must be a cause in fact, and to be a cause in fact in legal contemplation it must have a proximate relation to the harm which occurs, and it must be substantial in character. Home Gas and Fuel Co. v. Mississippi Tank Co., 246 La. 625, 166 So.2d 252 (1964); Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
As a starting point in a review of the evidence necessary to establish cause, it must frankly be conceded that certainty is generally unattainable from testimony produced in court. Sanders, Anatomy of Proof in Civil Actions, 28 La.L.Rev. 297 (1968). Instead, the law of evidence has long required that the testimony of witnesses be weighed by probabilities. Kemp v. Wamack, 2 La. 272 (1831).
When it is said that the plaintiff must establish a disputed fact by a preponderance of the evidence, the authorities have come to define this further as meaning that a plaintiff must prove that the existence of the disputed fact is more probable than its nonexistence. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276 (1964); Perkins v. Texas & N. O. R. R., 243 La. 829, 147 So.2d 646 (1962); Dixie Drive It Yourself System v. American Beverage Co., supra; Kemp v. Wamack, supra.
It is an elementary proposition that causation may be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963).
Guided by these principles, and after a review of the evidence, we are satisfied that plaintiffs have established their claim that damage resulted to their property and it was caused by the construction activity carried on by Boh Brothers under contract with the Sewerage and Water Board, after the contract had been approved by the city of New Orleans.
Defendants assert that Article 667 was not intended to apply to operations conducted by contractors on public property on behalf of the Sewerage and Water Board or the city of New Orleans. This thesis is based upon the contention that the Sewerage and Water Board and the City are not "proprietors" within the meaning of that Article. "Surely", they say, quoting from the decision of the Orleans Court of Appeal in Beck v. Boh Bros. Construction Co., 72 So.2d 765 (1954), "the redactors of the Civil Code did not intend to apply this article to a municipality. In the first place, the City is not the `owner' of its streets in the same capacity as is the owner of private property. The citizens themselves are the owners of the street.. . . it would be very drastic to extend the doctrine of the Hauck v. Brunet case [Hauck v. Brunet, La.App., 50 So.2d 495] so as to include the Sewerage & Water Board, or the City of New Orleans, or any other political subdivision as a `neighbor' *914 within the contemplation of the quoted article of the Code. Should that be done municipalities would be placed in a very desperate situation since, whenever work is done by them, they would be overwhelmed with suits . . . ."
We do not subscribe to this rationale. We know of no exculpatory principle, except sovereign immunity, which relieves public bodies or municipalities of the obligation to compensate those whose property it has damaged in carrying on public works; and, since sovereign immunity is inapplicable here, there is none. Of course we realize that the drainage project is needed and constitutes an improvement for the benefit of the public generally, but if the public desires and requires improvements they must pay for them. The burden of these operations cannot be shifted to individual property owners who, through no fault on their part, suffer damage on account of an activity for which a municipality is legally responsible. See La.Const. Art. III, § 35; Hamilton v. City of Shreveport, 247 La. 784, 174 So.2d 529 (1965); Hamilton v. City of Shreveport, 180 So.2d 30 (La.App.1965). Cf. La.Civil Code art. 660 and the cases cited in the annotations to that article holding public bodies responsible for obstruction or shifting the flow of drains, etc.
The contention that the Sewerage and Water Board and the City are not "proprietors" within the contemplation of Article 667 is also without merit. The public drainage system within the city of New Orleans of which this project is a part is constructed, controlled, maintained and operated by the Sewerage and Water Board. La.R.S. 33:4071. If necessary, the City is authorized to expropriate and take title to property needed by the Board; the title to all such public works, including this drainage canal, is thereby in the City. La.R.S. 33:4078. It cannot be denied, therefore, that insofar as this drainage canal and the land upon which it was constructed is concerned, the City, through the Sewerage and Water Board, and acting on behalf of the public, exercised the right to control and operate both the street and canal.
The word "proprietor" need not be limited to "owner". Any person assuming the position of owner, usufructuary, possessor in good or bad faith, or lessee, may qualify as proprietor by virtue of an expansive interpretation. Moreover, the proprietor may be liable not only for his own acts but also for the acts of others, such as servants, either by virtue of directly applicable provisions of the Civil Code (arts. 2317-24) or by virtue of a contractual relationship. (Yiannopoulos, Property, Legal Servitudes; Sic Utere, 32 La.L.Rev. 183, 186 [1972])
We refer again to Daigle v. Continental Oil Co., 277 F.Supp. 875 (W.D.La.1967), for this pertinent quotation:
Who is the "proprietor" of an estate? At common law, an estate can mean almost any interest in landa fee simple, a leasehold, a life estate, an estate pour autre vie. At civil law in Louisiana, Article 448 provides that "the word estate in general is applicable to anything of which riches or fortune may consist."
Based upon the foregoing formulation, Judge Hunter decided that the corporate owner of land and its tenant each held estates simultaneously in the same land, and each was a proprietor within the contemplation of Article 667. They were accordingly held liable in solido for damage to neighboring property caused by the lessee's activities. See also Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955), where a corporate oil and gas lessee was held liable in solido with its contractor for damage to a neighbor's house caused by the contractor's geophysical operations. See also D'Albora v. Tulane University, 274 So.2d 825 (La.App.1973).
In this case, therefore, the city of New Orleans, the Sewerage and Water Board and Boh Brothers are liable in solido to *915 plaintiffs for the damages we have found to be caused by the construction activity. La.Civil Code art. 2103. The quantum of damages has been stipulated and presents no issue requiring resolution by this Court.

The Coverage
Travelers issued a liability policy to the city of New Orleans and the Sewerage and Water Board which was in effect until May 25, 1963. The policy was renewed on that date for a one-year period. At all times during the construction activity, therefore, one of these two policies was in effect. Each policy affords coverage for $50,000 per occurrence and $100,000 aggregate for operations conducted by independent contractors. Each policy also contained an endorsement titled "Occurrence (Bodily Injury and Property Damage)" which provides:
SUCH INSURANCE AS IS AFFORDED BY THE POLICY FOR BODILY INJURY LIABILITY AND FOR PROPERTY DAMAGE LIABILITY APPLY SUBJECT TO THE FOLLOWING PROVISIONS:
1. In Insuring Agreement I, the words "and caused by accident" are deleted.
2. The term "occurrence" is substituted for "accident" wherever else it appears,. . .
3. Occurrence means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
Counsel for Travelers argues that the work carried on by the Sewerage and Water Board and Boh Brothers falls within the definition of a single occurrence, for it is, in fact, an exposure to "substantially the same general conditions." Therefore, each policy limit of $50,000 is applicable.
The record reflects that the construction started at Florida Avenue and proceeded down Louisa Street in the direction of Claiborne Avenue and the River. On May 25, 1963, the date the second Travelers policy became effective and the first one terminated, work had progressed as far as the intersection of Louisa and North Tonti Streets. This means the construction work had progressed four blocks, and obviously could only effect the owners of property within that area of the job. The buildings affected are those in the 2300, 2400, 2500 and 2600 blocks of Louisa Street; and, of course, all claims for damage on cross streets within that area. The remaining plaintiffs would necessarily fall under the terms of the second Travelers policy effective May 25, 1963. As our finding of fact shows, this job began on December 4, 1962 and was accepted as completed in March 1964.
Little help is afforded by the cases in this State on this issue. We do find, however, that when the word "occurrence" is substituted for "accident", as here, the intention manifested by this change is to broaden coverage. Hospital Service District No. 1 v. Delta Gas, Inc., 171 So.2d 293 (La.App.1965). See also Stevens Industries, Inc. v. Maryland Casualty Co., 391 F.2d 411 (5th Cir. 1968).
As a rational matter, however, it can hardly be said that this construction project lasting more than one year is a single "occurrence" within the contemplation of the quoted clause. Rather, we think it is more logical to view this project as a series of "occurrences" resulting in damages during the course of this prolonged undertaking. The word "occurrence" as used in the policy must be construed from the point of view of the many persons whose property was damaged. As to each of these plaintiffs, the cumulated activities causing damage should be considered as one occurrence, though the circumstances causing damage consist of a continuous or repeated exposure to conditions resulting in *916 damage arising out of such exposure. Thus, when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Notwithstanding, therefore, that the same causes may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence, but the damage to each plaintiff is a separate occurrence. Cf. Anchor Casualty Co. v. McCaleb et al., 178 F.2d 322 (5th Cir. 1950); Remmer v. Glens Falls Indemnity Co., 140 Cal.App.2d 84, 295 P.2d 19 (1956).
For the reasons assigned, it is ordered, adjudged, and decreed that there be judgment herein in favor of the plaintiffs named below in the amounts shown against the Sewerage and Water Board of New Orleans, City of New Orleans, Boh Brothers Construction Co., Inc., and Travelers Insurance Company, their insurer, in solido, with legal interest thereon from judicial demand until paid:

 Plaintiffs Amount
 Victor A. Lombard $ 2,750.00
 Mrs. Evelyn Dauboise, wife of/and 2,550.00
 Peter Henry
 Clarence O. Greene 7,300.00
 Emanuel Milton 1,400.00
 Mrs. Claudia Moore, wife of/and 1,550.00
 Len Evans
 Mrs. Arzella Penton, wife of/and 2,324.00
 Fred Fernandez
 Joseph Bruscato 1,600.00
 Mrs. Evelyn Meynier, wife of/and 1,250.00
 Frank Romaguera
 Mrs. Annie Buras, wife of/and 1,100.00
 Thomas Chanove
 Mrs. Viola Smith, wife of/and 1,750.00
 Leon Johnson
 Mrs. Ida Hill, wife of/and 1,250.00
 Raymond Garnier (Individually)
 Mrs. Louise Davis, wife of/and 2,600.00
 Alexander Olivier
 Mrs. Mildred Wyre, widow of 1,900.00
 Edward Reese, individually and as
 a representative of the estate of
 her deceased husband, Edward
 Reese, and as tutrix of her minor
 children
 Mrs. Vivian Logan, wife of/and 1,535.00
 Edwin B. Bolds
 Mrs. Lillie Green, wife of/and 1,950.00
 Rev. George A. Beacham
 Mrs. Alvichear Logan, wife of/and 2,050.00
 Theophiles Tanner
 Mrs. Louise Jackson, wife of/and 1,535.00
 Earl Hankton
 Mrs. Shirley H. Westley, wife of/and $ 1,600.00
 John W. Hence
 Joseph Amedee 1,900.00
 Julius McMorris 625.00
 Mrs. Evelyn Green Davis 1,560.00
 divorced wife of Clabon Davis, Jr.
 Owens Hall, Sr. 2,200.00
 Mrs. Beatrice Lewis, widow of 1,675.00
 Alexander Weaver, individually
 and as representative of the estate
 of her deceased husband, Alexander
 Weaver, and as tutrix of her minor
 children
 Donald R. Hall 2,950.00
 Mrs. Martha Anderson, wife of/and 1,200.00
 Murray Manning
 Mrs. Alice Blanton, widow of 1,650.00
 Albert Banks
 Mt. Moriah Baptist Church, Inc. 2,215.00
 Miss Pearlie Bunch 1,355.00
 Mrs. Jeanette R. Recard, wife of/and 1,700.00
 Alja Meyers
 Mrs. Emma Johnson, wife of/and 1,275.00
 Rev. Jack Williams
 Mose Toussant 1,735.00
 Ernest Proctor 8,350.00
 Mrs. Edith Hewitt, wife of/and 1,675.00
 Motton Dillon
 Mrs. Ruby Porche, widow of 1,950.00
 Stanford Victor
 Mrs. Uldean V. Green, wife of/and 1,600.00
 Earl Jupiter
 Arthur Winfield 1,000.00
 Mrs. Katie Scott, widow of 1,650.00
 Dorsey Brandon
 Alfred Brandon
 Eddie Brandon
 Mrs. Ethel Larieau, widow of 650.00
 Dave White, individually and as
 representative of the estate of
 her deceased husband, Dave White,
 and as tutrix of her minor children
 Will Terrel 2,300.00
 Mrs. Elvira Smith, wife of/and 1,300.00
 Henry Tate
 Mrs. Katie Mae Ellis, wife of/and 3,600.00
 Rev. Eddie B. Scott
 Robert Pipkins 2,150.00
 Mrs. Stella Sandoz Staten 1,400.00
 Mrs. Evelyn Toussaint, widow of 2,000.00
 Albert Rowe, individually and as
 representative of the estate of
 her deceased husband, Albert Rowe
 Miss Lucy Mae, a/k/a Geraldine 1,300.00
 Pauline
 Miss Janice Pauline
 Eugene B. Scott 2,250.00
 Mrs. Thelma Palmer, widow of 1,350.00
 Isaiah Porter
 Nathaniel Porter
 Mrs. Isabella Morris, wife of/and 1,485.00
 Herman Morris
 Mrs. Alfreda Robinson, wife of/and 1,900.00
 Edward Jackson
 Mrs. Irene Coston, wife of/and 1,500.00
 Ferdinand B. Toussant
 Arthur Mitchell 1,000.00
 Mrs. Georgianna Crier, widow of 1,000.00
 Charles Howard
 Curtis Howard

*917
 Mrs. Josie Bell Franklin, widow $ 1,000.00
 of Willard Smart, individually
 and as representative of the
 estate of her deceased husband,
 Willard Smart, and as tutrix of
 her minor children
 Mrs. Delores Bolds, wife of/and 1,500.00
 Harrison Monie
 Mrs. Ruby Taylor, wife of/and 1,250.00
 Ike Mayfield
 Mrs. Viola Jones, widow of 1,650.00
 Clifford Coignet, individually
 and as representative of the
 estate of her deceased husband,
 Clifford Coignet, and as tutrix
 of her minor children
 Mrs. Elizabeth Thompson, divorced 2,200.00
 wife of Julius McMorris
 Mrs. Ruth Mix, wife of Frank Bernard 2,300.00
 Mrs. Christina Johnson, wife of/and 850.00
 Thomas Pate
 Mrs. Betty Poree, wife of/and 1,050.00
 Lawson W. Palmer
 Mrs. Florence Payne, widow of 1,000.00
 Emanuel Lewis, individually and
 as representative of the estate of
 her deceased husband, Emanuel Lewis
 Mrs. Emma Green, wife of/and 2,800.00
 Joseph Washington
 Mrs. Rhea Echar, widow of Leland 900.00
 J. Moran, individually and as
 representative of the estate of
 her deceased husband, Leland J.
 Moran
 Henry Milburn 2,850.00
 Holly Thompson 1,850.00
 Mrs. Mable Denny, wife of/and 750.00
 Abraham Robinson
 Mrs. Bertha Steward, widow of 1,475.00
 Alfred Johnson, individually and
 as representative of the estate of
 her deceased husband, Alfred Johnson
 Clark R. Cosse 1,550.00
 Mr. & Mrs. Harold Imhoff 4,600.00
 Mr. & Mrs. Alfred P. Boudreaux 1,800.00
 Nevelin W. Wilson 1,700.00
 Lawrence M. Bulot 900.00
 Bennie A. Lions, Sr. 3,100.00
 Edward E. Gettys 1,600.00
 Clarence A. Brakel 2,700.00
 Lloyd E. David 1,950.00
 Mrs. G. Roberts 2,300.00
 Herman A. Groz 2,100.00
 Mrs. Abbie Guapp 975.00
 Percy J. Albert 2,400.00
 John L. Vicari 2,000.00
 Shirley L. Schenick 2,300.00
 James J. Merz 2,420.00
 George A. Nehlig 500.00
 Mrs. Mamie E. Selzer 2,750.00
 Mrs. Valsin C. Selzer
 Adam M. Brady 2,000.00
 Edward J. Winkler 1,150.00
 Louis F. Zeringue 900.00
 Mrs. Catherine A. Gettys 450.00
 Floyd O. Neumann 2,200.00
 Jose Valenzuela 225.00
 Lester J. Chaplain 2,000.00
 Floyd R. Boda 250.00
 Mrs. Anthony J. Talamo 2,050.00
 Henry J. Philebar, Sr. 1,400.00
 Mrs. Richard T. Hill 2,300.00
 Aledore Sylvia $ 1,000.00
 Mrs. J. Montz 500.00
 Mrs. Bertha B. Price 1,850.00
 Mrs. Bertha E. Bauer 800.00
 John E. Franze, Jr. 300.00
 Charles H. Williams 2,000.00
 Archie H. Arroyo 2,300.00
 Frances M. Salone 1,825.00
 Edward J. Frey 2,200.00
 Mrs. Thomas Carbone 2,050.00
 Virgil V. Ryan 800.00
 Elizabeth S. Leavelle 500.00
 Mrs. M. Massaro 2,300.00
 Isador W. Falco, Jr. 1,350.00
 Amede Jeanfreau 2,000.00
 Mrs. Mary Trascher 1,950.00
 Mrs. Mary H. Brugier 2,700.00
 Adele S. Netter 1,375.00
 Sameul Lampo and 1,250.00
 Mrs. Louise Rohli Lampo
 Joseph D. LeBlanc and 1,100.00
 Mrs. Cecile Michel LeBlanc
 Mrs. Alice Schaule Reiser 1,900.00
 Henry F. O'Brien, Jr. and 800.00
 Mrs. Marguerite Ader O'Brien
 Joseph L. Sorbet and 2,550.00
 Mrs. Lillie Mae Bourg Sorbert
 Mrs. Mary Daroca Pretus 1,150.00
 Thomas J. Carter 950.00
 Salvador Tuminella 3,000.00
 Sidney R. Inch and 100.00
 Mrs. Frances Edel Inch
 Mrs. Amy Cothauer, widow of 1,300.00
 Peter C. Aiena, Sr.
 Benjamin Arabie 1,600.00
 Jasper Skates 2,050.00
 Orleans Parish School Board 3,650.00
 Johnson-Locket School
 Beatrice Williams, widow of 1,550.00
 Dennis Schanette

All costs of court are taxed against the defendants.
BARHAM, J., concurs with reasons.
DIXON, J., concurs.
BARHAM, Justice (concurring).
The majority here has returned to a Code article which cannot serve the purpose for which the majority applies it and by wrenching and distorting the clear language of that Codal provision found an equitable result, without providing a legal foundation. The majority has now stated that although Civil Code Article 667 is a legal limitation imposed upon the rights of "proprietors" in the use of their property, they are now willing to call anyone a "proprietor", in order to reach a result which broadens the base for liability for damages *918 resulting from hazardous activities which cause damage even with the exercise of due care. Without telling us how or why, the majority has held that not only is the "proprietor" liable for acts which affect his neighbors, but that non-proprietors are solidarily liable with the proprietor for the proprietor's liability under Article 667. The majority opinion fails to tell us from where is derived the solidary liability of non-proprietors. It does not claim that defendants were negligent; it does not claim a contractual relation between non-proprietor-defendants and the plaintiffs; they simply hold that non-proprietors are liable.
I have previously stated my great disappointment at the strained construction which has been used by this Court in the past to find liability for non-negligent acts in the conduct of ultrahazardous activities, i. e., activities which when carried on with the greatest degree of care, may nevertheless cause damage.
In a series of cases, beginning with Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375 (1970); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971), in concurrence in Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181 (1971), and in dissent in Hilliard v. Shuff, 260 La. 384, 256 So.2d 127 (1971), I have tried to expose the fallacy of the rationale here presented by this majority. See also Barham, A Renaissance of the Civilian Tradition in Louisiana, 33 La.L.Rev. 357, pp. 381-385. The only way an opinion based upon law and legal methodology can present the result obtained by the majority here is through use of Civil Code Article 2315, analogizing Civil Code Articles 667 through 669, through application of Civil Code Articles 2315 and 2317, or through application of 2315 under a general analogy with all of the other enumerated Code articles. Application of Civil Code Article 667 per se to a solution of this problem by the majority cannot cast responsibility on parties other than the "proprietor". Other parties in privity to the proprietor or who have some relational interest with him or obligation to him, concern us only with the proprietor's third party rights against the third party defendants. Since parties other than proprietor are not made responsible for non-negligent acts under 667 (nor has the majority cast this liability under any other Code article) they can only be cast for damages under the majority's theory of the case if they are negligent. The majority did not find them negligent. It imposed liability without fault under an article of the Code which does not encompass liability without fault on their part.
The result is correct. The rationale of the majority opinion will not support it, however.
I respectfully concur.