616 So.2d 764 (1993)
Walter WHETSTONE, Individually and on Behalf of His Minor Children, Pamela Renee Whetstone, Jewelry Dawn Whetstone, April Suzanne Whetstone and Jason Bowman Whetstone
v.
Johnny R. DIXON, Peggy Stewart, State Farm Insurance Company, Faith & Truth Baptist Church and Preferred Mutual Insurance Company[1].
No. CA 920123.
Court of Appeal of Louisiana, First Circuit.
March 5, 1993.
Rehearing Granted to Correct Concurrence April 28, 1993.
*766 Donald L. Carmouche, Talbot, Sotile, Carmouche, Marchand and Marcello, Donaldsonville, for plaintiff/1st appellant, Walter Whetstone.
Leonard Cardenas, III, Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for defendant, Preferred Risk Mut. Ins. Co.
Henry Salassi, Jr., Mangham, Hardy, Rolfs and Abadie, Baton Rouge, for defendant, Faith and Truth Baptist Church.
Tim A. Tullos, Lane, Fertitta, Lane & Tullos, Baton Rouge, for defendants, Johnny Ray Dixon and State Farm Ins. Co.
Errol J. King, Baton Rouge, for intervenor/2nd appellant, Community Health Network.
Before EDWARDS, SHORTESS and WHIPPLE, JJ.
WHIPPLE, Judge.
This is an appeal by plaintiffs, Walter Whetstone, individually and on behalf of his minor children, Pamela Renee Whetstone, Jewelry Dawn Whetstone, and April Suzanne Whetstone from a judgment of the trial court which found that Faith and Truth Baptist Church (Faith and Truth) was not vicariously liable for the negligence of defendant, Johnny R. Dixon, and that the policy of insurance issued to Faith and Truth by Preferred Risk Mutual Insurance Company (Preferred Risk) did not afford coverage to Dixon. Intervenor, Community Health Network of Louisiana, Inc. also appealed. Faith and Truth answered the appeal contending the trial court erred in finding that Dixon's negligence was the sole cause of the accident. For the following reasons, we affirm in part, reverse in part and remand.

FACTS AND PROCEDURAL HISTORY
This case arises from an automobile accident which occurred on May 31, 1990, on Louisiana Highway 10 between Jackson and Clinton, Louisiana. Highway 10 is a two-way, two-lane road accommodating both eastbound and westbound traffic. Prior to the accident, Dixon was driving his 1980 Chevrolet pickup truck eastbound toward Clinton. Peggy Stewart was traveling westbound in a 1979 Mercury Cougar owned by Irma Stewart. Shakitha Cobb and Terry James were passengers in the Stewart vehicle. Behind the Stewart vehicle at a distance of approximately one and a half car lengths, Amy Whetstone was also traveling westbound in a 1988 Chevrolet Corsica which she owned. Her daughter, April Whetstone, was a passenger in the Whetstone vehicle.
Dixon was a member of the Board of Deacons of the Faith and Truth Baptist Church, located in Jackson, Louisiana. The Faith and Truth church building was being remodeled under the direction and responsibility of the Board of Deacons. Thus, Dixon's duties included assisting in this remodeling project.
At the time of the accident, Dixon was on his way to Clinton, Louisiana to pick up materials to be used in the remodeling of the church. Dixon testified that immediately prior to the accident, while driving with his window down, a bee entered his vehicle through the window and landed on his arm. He began slapping at the bee, and when he looked up, he glimpsed another car. Dixon stated that he realized that he was going to hit the car and tried to maneuver his truck to avoid a collision. He was unable to do so and the Dixon and Stewart vehicles collided.
*767 Peggy Stewart testified at trial that as she was traveling in a westerly direction on Highway 10 at approximately forty to forty-five miles per hour, she observed Dixon, who was traveling in an easterly direction, swatting at something with his hand. Stewart stated that as Dixon was swatting with his hand, his truck was moving toward her lane of travel. In an effort to avoid the accident, she attempted to move her vehicle as far as possible to the right side of her lane of travel. Stewart further testified that the Dixon vehicle then crossed the center line, entering her lane of travel, and struck her vehicle. Stewart stated that she did not observe what happened after this collision.
Dixon testified that after he "swiped" the Stewart vehicle, he remembered another impact, but never saw the Whetstone vehicle. As a result of the collision of the Dixon and Whetstone vehicles, Amy Whetstone was killed and her daughter, April Suzanne Whetstone, sustained serious injuries.
Paul Garon witnessed the accident and testified at trial regarding the events that occurred. Garon was traveling eastbound on Highway 10 behind the Dixon vehicle. Garon testified that he saw a yellow car, referring to the Stewart vehicle, cross to the left of the center line, at which point the Dixon vehicle struck the Stewart vehicle. Garon stated that the collision between the Stewart and Dixon vehicles occurred near the middle of the road, but he believed that it occurred more on the eastbound lane side. Garon testified that after the impact between the Dixon and Stewart vehicles, Dixon's vehicle first went right, then came back left and struck the Whetstone vehicle head-on. Thus, Garon was of the opinion that the collision between the Dixon and Whetstone vehicles was caused by Stewart driving left of center.[2]
Gary J. Vines, Sr., a master trooper with the Louisiana State Police, investigated the accident involving the Dixon, Stewart, and Whetstone vehicles. Trooper Vines testified that photographs and measurements were taken at the scene, and that he viewed the physical evidence at the scene of the accident and inspected the vehicles involved. Vines stated that all of the physical evidence at the scene was found in the westbound lane of Highway 10. Because there was no debris or physical evidence of any impact occurring in the eastbound lane, Trooper Vines concluded that the impact between the Dixon and Stewart vehicles occurred in the westbound lane of travel.
On November 14, 1990, Walter Whetstone filed a petition for damages naming as defendants: Stewart; Dixon and his insurer, State Farm Mutual Automobile Insurance Company; and Faith and Truth and its alleged insurer, Preferred Risk. Preferred Risk denied liability and filed a cross-claim against Stewart. Dixon and his insurer, State Farm, also denied liability and filed a third party demand against Stewart and Preferred Risk. Faith and Truth also eventually filed a cross-claim against its insurer, Preferred Risk. On January 10, 1991, State Farm tendered a payment to plaintiff by depositing the sum of $48,400.00 into the registry of the court. On March 27, 1991, Community Health Network of Louisiana, Inc., the Whetstones' health insurer, intervened for medical expenses paid on behalf of the Whetstones as a result of the accident.
After a bench trial held on July 17, 1991, the trial court found no negligence on the part of Stewart and found Dixon solely at fault in causing the accident. Accordingly, judgment was rendered in favor of plaintiffs and against Dixon, awarding damages to the plaintiffs in the stipulated amount of $995,000.00. The judgment also dismissed all claims, cross-claims and third party demands against Stewart, Preferred Risk and Faith and Truth.
Plaintiffs timely appealed and specified the following assignments of error:
1. The trial court committed manifest error in failing to find that Faith and Truth is vicariously liable for the negligence of Dixon.

*768 2. The trial court committed manifest error in failing to find Preferred Risk liable for the stipulated damages.
3. The trial court committed manifest error in failing to find that Dixon is an insured and that the Preferred Risk policy affords him coverage.
4. The trial court committed manifest error in failing to find the Preferred Risk policy afforded $600,000.00 in coverage.
Preferred Risk answered the appeal and assigns error to the trial court's finding of negligence on the part of Dixon. Intervenor, Community Health Network of Louisiana, Inc. also appealed.

NEGLIGENCE OF DIXON
Faith and Truth and Preferred Risk assert that the trial court erred in finding Dixon negligent in causing the accident involving the Dixon, Stewart and Whetstone vehicles. Preferred Risk further asserts that the trial court committed reversible error in admitting the opinion testimony of Trooper Vines on the issue of where the impact occurred and in considering this opinion in deciding Dixon was negligent. Preferred Risk argues that the erroneous admission of this opinion testimony tainted the trial court's factual findings. Thus, Preferred Risk argues, the trial court's determination of negligence should be accorded no weight and this court should independently review the evidence on this issue.
Trooper Vines is not an expert in accident reconstruction. LSA-C.E. art. 701 allows a lay witness to give testimony in the form of opinions or inferences if those are: (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.
Therefore, if a state trooper is not qualified as an accident reconstruction expert, his testimony in the form of opinions is limited to those opinions based upon his rational perception of the facts and recollections pertaining to the scene of the accident. Fontenot v. Cooper, 599 So.2d 883, 885 (La.App. 3rd Cir.), writ denied, 604 So.2d 1305 (La.1992).[3]
In the instant case, the trial judge recognized that Trooper Vines was not an accident reconstruction expert, but noted that Trooper Vines had some degree of training and experience in making determinations of points of impact. In the course of his training, Trooper Vines took courses involving investigation of motor vehicle accidents and the gathering and reviewing of evidence at an accident scene. Moreover, Trooper Vines had sixteen years of experience in investigating automobile accidents on the highways of Louisiana.
In deciding to allow Trooper Vines to give his opinion concerning the point of impact between the Dixon and Stewart vehicles, the trial judge stated that Trooper Vines would have to support his opinion with physical findings and that the trial court would weigh this evidence very carefully.
Trooper Vines testified at trial that he based his opinion concerning the point of impact on the physical evidence, including the fact that there was no debris or physical evidence of any kind in the eastbound lane of travel. Therefore, we find that the opinion testimony of Trooper Vines in this case was rationally based on his perception of the accident scene and the physical evidence he observed.
The admissibility of lay opinion testimony is subject to the balancing test of LSA-C.E. art. 403, which provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
It is generally thought that opinion testimony of a trooper will be considered "the law" by a jury, thus misleading and prejudicially influencing the jury. Fontenot, 599 So.2d at 886. However, the same considerations *769 were not present in this bench trial. The trial judge was certainly capable of according the opinion testimony of Trooper Vines the proper weight, as evidenced by his statements that he would "very carefully" weigh and "test [Trooper Vine's] conclusions." We conclude that the trial court did not err in allowing Trooper Vines to give his opinion concerning the point of impact between the Dixon and Stewart vehicles.
Accordingly, in the absence of any legal error by the trial court in this regard, as an appellate court, we are unable to disturb the lower court's factual findings in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In concluding that Dixon's negligence was the sole cause of the accident, the trial court noted that immediately prior to the collision of the Dixon and Stewart vehicles, Dixon was swatting or slapping at a bee that had lighted upon his arm. Dixon further testified that when he looked up, he glimpsed another car and realized he was going to hit the car.
Stewart testified that as the Dixon vehicle approached in the eastbound lane, she saw Dixon swatting at something, and at that point, Dixon's vehicle crossed the center line and struck her vehicle. Moreover, Trooper Vines testified that all of the debris and physical evidence of a collision was located in the westbound lane of travel.
Although Paul Garon testified that he saw the Stewart vehicle cross the center line and make contact with the Dixon vehicle, he admitted that he was very tired and may not have been very observant on the date of the accident. Garon stated that the focus of his attention just prior to the accident had not been on Dixon or Dixon's movements, and he agreed that it was possible that if in fact the Dixon vehicle had swerved over the center line, he could have failed to observe such movement.
Based upon the record before us, we are unable to conclude that the trial court manifestly erred or was clearly wrong in finding Dixon at fault. Thus, we find no merit in Preferred Risk's argument that the trial court improperly found that Dixon's negligence was the sole cause of the accident.

VICARIOUS LIABILITY
Plaintiffs contend in their first assignment of error that the trial court erred in finding that Faith and Truth was not vicariously liable for the negligence of Dixon. We agree.[4]
Faith and Truth is a religious organization which has been in existence for over 100 years. Information regarding the organization and structural hierarchy of the church was presented through the testimony of Dixon and Deacon Richard King, chairman of the Board of Deacons.
The church has no employees in the sense that it does not pay anyone a salary. The structural hierarchy of the church includes the pastor and the Board of Deacons, neither of whom are compensated for their services. The Board of Deacons is selected by church members. Dixon is an ordained member of the Board of Deacons.
As a member of the Board of Deacons, a deacon has the responsibility to conduct church services when the pastor is not present. It is also the duty of the Board of Deacons to maintain the church and its premises. This duty includes such tasks as removing fallen limbs, grass cutting, and painting. As the chairman of the Board of Deacons, King has the responsibility of assigning tasks to the deacons, who have a duty to follow his instructions.
At the time of the accident, the Faith and Truth church was being remodeled. This project was overseen and performed chiefly *770 by the members of the Board of Deacons. As part of this project, members of the board also had the duty of picking up materials needed for the remodeling. The only vehicle Faith and Truth owned was a church bus; therefore, the board members were expected to use their own vehicles to pick up building materials.
On the evening prior to the date of the accident, an informal meeting of several members of the Board of Deacons was held, during which the board discussed the additional materials needed for the project. Dixon was selected to pick up the needed materials on the following day. While en route to pick up these materials, the accident occurred.
Masters and employers are answerable for the damage caused by their servants in the exercise of the functions in which they are employed. LSA-C.C. art. 2320. However, a principal is not liable for the physical torts of a non-servant agent. Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, 906 (1968). Thus, the determination of whether a party may be held vicariously liable for the torts of another depends on whether the tortfeasor is characterized as a servant.
A servant has been defined as one employed to perform services in the affairs of another and who is subject to the other's control or right to control with respect to the physical conduct in the performance of the services. Ermert v. Hartford Insurance Company, 559 So.2d 467, 476 (La.1990). In contrast, a non-servant agent, although a contributor to the business of his master, is not such a part of his master's business that his physical acts and the time to be devoted to the business are subject to control. Blanchard, 215 So.2d at 907.
In the instant case, the issue involves a religious organization's liability for the negligence of one of its deacons, who is not compensated for his services. An individual who volunteers services without an agreement for or expectation of reward may be deemed the servant of the one accepting those services. Whether the volunteer is to be considered a servant generally depends on the religious organization's right to control the activities of the volunteer. Doe v. Roman Catholic Church for Archdiocese of New Orleans, 602 So.2d 129, 133 (La.App. 4th Cir.), vacated and remanded, 606 So.2d 524 (La.1992).[5]
In analyzing whether a master-servant relationship existed, the trial court in its written reasons for judgment considered several factors which it gleaned from Louisiana cases as well as cases from other jurisdictions.[6] These factors included: (1) uncompensated performer, (2) status within the association, (3) specific mission, (4) intense relationship, (5) control, (6) role of the church in conferring authority and exercising control and (7) direct benefit to the association.
Regarding the fact that Dixon was an uncompensated performer, the trial court stated that Dixon was "perhaps more than a volunteer" because he assumed continuing responsibilities for the church and because of the continuing delegation of duties by the unincorporated association. We note that although the existence of an economic relationship is one factor that may be used for determining the existence of a master-servant relationship, it is not essential to that determination. Whittington v. Sowela Technical Institute, 438 So.2d 236, 246 (La.App. 3rd Cir.), writs denied, 443 So.2d 591, 592 (La.1983).
Considering the second factor of status within the association, the trial court concluded that as a deacon, Dixon was closer to "executive status" than regular membership, *771 noting that the deacons had special authority and higher responsibility than regular members.
The trial court also acknowledged that at the time of the accident, Dixon was on a specific mission for the church which was directly related to the scope of his authority and duty. Dixon made the trip at the request of the deacon board, and the trip clearly was not coincidental with any personal mission.
Regarding the factor of intense relationship, the trial court concluded that although the deacons had a continuing responsibility to maintain the church building and grounds, the project of rebuilding or remodeling the church was not the ordinary, routine or general performance of their duties. Rather, it was "a once in a lifetime project, intense in nature." The building project continued over several months and required frequent and direct performance by the deacons with projected deadlines. Deacon King testified that all the deacons worked long hours on this project, sometimes working until 11 or 12 midnight.
In considering the issue of control, the trial court concluded that the directive by members of the deacon board to Dixon to obtain certain building materials was clear, and the approved places where he was to obtain these materials was designated. Furthermore, the court acknowledged that as a general rule in the law of masterservant relationships, the higher the office held or authority exercised by the servant, the less the exact details of the accomplishment are specified by the master. As the Louisiana Supreme Court has stated, "[t]he scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks." Ermert, 559 So.2d at 477.
As acknowledged by the trial court, the church members had the power to select members of the deacon board, and the church membership was also vested with "discharge authority." Both Deacons King and Dixon testified that if a deacon failed to fulfill his duties and responsibilities, the deacon would be brought before the body of the church for the membership to decide whether he should be removed from the Board of Deacons.
Finally, the trial court noted that Dixon's activities in picking up building supplies for the church was a direct and immediate economic benefit to the church as money would be saved by having the deacons use their own vehicles to obtain materials in lieu of having the materials delivered commercially.
After considering all of these factors, the trial court stated:
Under the facts of this case and the policy considerations of vicarious liability, it would not offend this Court to find that the church, the entity, the unincorporated association should be responsible for the negligent act of one of its non-employee leaders on a direct mission of economic benefit for the church at the particular time and place of the accident.
However, the trial court failed to find such vicarious liability, instead holding that Dixon was a non-servant agent, a finding inconsistent with its own analysis of the facts proven in this case. In concluding that Faith and Truth was not vicariously liable for the negligence of Dixon, a non-servant agent, the trial court stated that there were "equal underlying policy considerations" to be considered and stated that "[c]hurches, benevolent organizations, charities and civic organizations cannot be responsible for the negligent acts of all of those who help serve their purposes." It is apparent from the record herein and the lower court's stated reasons for judgment that the trial court concluded that Faith and Truth should be accorded immunity by virtue of its status as a charitable institution. We note that the Louisiana Supreme Court abolished the doctrine of charitable immunity as a defense to tort liability in Garlington v. Kingsley, 289 So.2d 88 (La.1974).
As conceded by the trial court, Dixon was "more than a casual volunteer" and indeed was a "non-employee leader" of Faith and Truth. Both the church membership and the Board of Deacons had the *772 right to exercise and did, in fact, exercise control over Dixon. The membership had the right to discharge Dixon from his position as a deacon if he failed to perform his duties. The deacon board was responsible for the planning and execution of the church remodeling project and Deacon King had the authority to assign specific tasks to the members of the deacon board. Moreover, regarding the specific task at issue, members of the deacon board directed Dixon concerning the materials to purchase, designated the approved places to obtain the specified materials and designated the general time by which delivery was expected.
Although the specific time and route for travel were not dictated to Dixon, this defendant held one of the highest levels of authority and responsibility within the hierarchy of the church such that precise details were unnecessary. Therefore, we conclude that the trial court's finding that Dixon was a non-servant agent rather than a servant of Faith and Truth is not only inconsistent with its own written analysis, but is also inconsistent with the undisputed facts regarding the relationship between Dixon and Faith and Truth.[7]
Consequently, we find the trial court erred in failing to hold Faith and Truth vicariously liable for the negligence of Dixon in causing the accident in question.
This assignment of error has merit.

INSURANCE COVERAGE
Plaintiffs next assign error to the trial court's finding that Preferred Risk was not liable for the stipulated damages. Preferred Risk provided a general liability insurance policy to Faith and Truth which by virtue of endorsements provided coverage for automobiles under certain circumstances. The trial court agreed with the proposition that if Dixon was a servant of Faith and Truth, then the insurance policy provided to Faith and Truth by Preferred Risk would apply, and coverage would be afforded under the policy. The trial court then concluded that because Dixon was not a servant of Faith and Truth nor an "insured" under the policy, there was no coverage under this policy.
Having found that Faith and Truth is vicariously liable for the negligence of its servant, Dixon, we must determine whether the provisions of this policy provide coverage for this accident.
The commercial general liability insurance policy was altered by the inclusion of an amendatory endorsement affording business auto coverage. This amendatory provision provided Faith and Truth with additional insurance coverage as follows:
1. Insuring Agreement of Coverage A (Section I) of the Commercial General Liability Coverage Form applies to all sums an `insured' legally must pay as damages because of `bodily injury' or `property damage' to which this insurance applies, caused by an `accident' and resulting from the maintenance or use of a covered `auto.'
An "insured" for purposes of the amendatory endorsement includes, "You [Faith and Truth] for any covered `auto.'" As stated in the policy, "you" refers to the named insured, Faith and Truth Baptist Church.
The term "Covered autos" under this amendatory endorsement includes "nonowned autos," which are defined as follows:
2. NONOWNED `AUTOS' means those `autos' you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes `autos' owned by your employees or partners or members of their households but only while used in your business or your personal affairs. (Emphasis added.)
Clearly, under the above cited policy provision, Dixon's vehicle was a nonowned vehicle which was not "own[ed], lease[d], *773 hire[d], rent[ed] or borrow[ed]" by Faith and Truth and was being "used [by Dixon] in connection with ... [Faith and Truth's] business" at the time of the accident in question.[8] Faith and Truth, as the named insured, is afforded coverage under the policy for the accident at issue herein. Moreover, under the policy language cited above, we conclude the Preferred Risk policy also insured Faith and Truth for its vicarious liability for Dixon's negligence while operating a nonowned auto as defined in the policy.

POLICY LIMITS
Although the trial court found no vicarious liability, and, accordingly, no insurance coverage under the Preferred Risk policy, the trial court nonetheless addressed the issue of the amount of coverage that the policy would have provided in this instance. Plaintiffs assert that the trial court erred in determining that the insurance policy issued by Preferred Risk only afforded $300,000.00 coverage.
The "general aggregate limit" of insurance provided by this policy is $600,000.00, and the "each occurrence limit" is specified in the policy as $300,000.00.
Under the "DEFINITIONS" section of the policy, occurrence is defined as follows:
10. `Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
Plaintiffs cite the Louisiana Supreme Court case of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973), for the proposition that when the word "occurrence" is used in place of the word "accident," the intention is to broaden coverage and that the claim of each plaintiff should be considered a separate occurrence. Thus, plaintiffs contend, the death of Amy Whetstone and the injuries of April Whetstone constitute two separate occurrences, with coverage afforded in the amount of $300,000.00 each.
In Lombard, the policy endorsement at issue specifically stated that "[t]he term `occurrence' is substituted for `accident' wherever ... it appears." Moreover, the endorsement also stated that "[o]ccurrence means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused." Lombard, 284 So.2d at 915. (Emphasis added.) However, in the Preferred Risk policy at issue herein, the "DEFINITIONS" section states that "`[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Thus, by definition, the Preferred Risk policy narrows the scope of coverage as manifested by this policy language.[9]
Moreover, we find that the facts of the Lombard case are distinguishable from the facts in the instant case. In Lombard, a construction project lasting more than one year caused damage to many houses. The Supreme Court viewed the construction project as "a series of `occurrences' resulting in damages during the course of this prolonged undertaking." Lombard, 284 So.2d at 915. Thus, the Court concluded that as to each plaintiff, the cumulated activities causing damage should be considered one occurrence.
In the instant case, however, the injuries of April Whetstone and the death of Amy Whetstone occurred as the result of the collision between the Whetstone and Dixon vehicles, which was one accident, exposing the Whetstones to "substantially the same generally harmful conditions." The language *774 in the insurance contract which defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" is clear and unambiguous, and thus, must be enforced as written. Central Louisiana Electric Co., Inc. v. Westinghouse Electric Corporation, 579 So.2d 981, 985 (La.1991). Therefore, we conclude that the claims asserted herein were the result of one occurrence as defined in the policy issued to Faith and Truth by Preferred Risk and are constrained to conclude that the coverage afforded under the policy is limited to $300,000.00.
We note that although plaintiffs' petition asserts a claim on behalf of Jason Bowman Whetstone, the judgment rendered by the trial court makes no provision for or disposition of this claim. We are unable to determine from the record whether this omission was a clerical error or oversight, or whether there was a substantive reason to omit this claim from the judgment.
Moreover, although Jewelry Dawn Whetstone achieved majority and was substituted as a party plaintiff prior to trial, the judgment rendered by the trial court disposed of her claim by awarding judgment on her behalf in favor of her father, Walter Whetstone.
Also, although the parties stipulated to damages in the amount of $995,000.00, we are unable to determine from the record how the damages were to be distributed or the basis therefor. The stipulation recited in the record states:
There are three surviving children and one surviving spouse and awards of $175,000 to each for a total of $700,000 representing wrongful death damages. April Whetstone for personal injuries $100,000. She had past and future medical expenses of $25,000 and a claim for loss of support on behalf of the survivors of Amy of $170,000 and a total amount of damages we have agreed would probably be supported by the evidence would be stipulated to as $995,000.
However, elsewhere in the record, the parties stipulated that "Walter Whetstone was married to Amy Whetstone who is now deceased, that they the parents of the major Jewelry Whetstone and the minors, April and Pamela." Thus, we are unable to clearly determine from the record before us how the stipulated damages should be distributed among these individuals.
Moreover, we are unable to determine from the record, the policy limits and/or the amount of the credit, if any, due for payments by State Farm Mutual Automobile Insurance Company. While the stipulation of the parties states "that State Farm has already paid its policy limits of $50,000 into the registry of Court and has no further obligation," the motion and order relating to the deposit of funds in the registry of the court by State Farm refers to the sum of $48,400.
Also, in its brief to this court, intervenor, Community Health Network of Louisiana, Inc., states that "[a]s noted in the trial court's Reasons for Judgment, the parties have agreed and stipulated to the amount of all damage claims including the claim of Community Health Network" and that in the event of reversal of the trial court, "then Community Health Network should be awarded the amount of its medical expense subrogation claim." However, we are unable to find this stipulation in the record or to ascertain from the record the amount, if any, due Community Health Network of Louisiana, Inc. on its intervention.
An appellate court can remand an action for proper consideration, when the record is so incomplete that the court is unable to pronounce definitely on presented issues or where parties have failed, for whatever reason, to produce available evidence material to a proper decision. Dangerfield v. Harris, 484 So.2d 838 (La.App. 1st Cir.1986). As we do not have sufficient evidence before us to make a proper distribution of the claims and demands asserted in the matter before us, we are forced to remand this case to the trial court for resolution of these issues, consistent with the views expressed herein. See Thomas v. Thomas, 552 So.2d 793 (La.App. 1st Cir.1989).

DECREE
For the foregoing reasons, we affirm the judgment finding Dixon negligent and dismissing *775 all claims, cross-claims and third party demands against Peggy Stewart. We reverse that portion of the judgment which found that Faith and Truth is not vicariously liable for the negligence of Dixon. We also reverse the portion of the judgment which found that the policy issued by Preferred Risk Mutual Insurance Company to Faith and Truth Baptist Church does not afford coverage herein. We remand to the trial court for further proceedings consistent with the views expressed herein, including a determination of the distribution of damages and the amount of credit, if any, due State Farm Mutual Automobile Insurance Company and for a determination of the amount, if any, due intervenor, Community Health Network of Louisiana, Inc.
Costs of this appeal are assessed 50% against plaintiffs and 50% against defendants, Faith and Truth Baptist Church and Preferred Risk Mutual Insurance Company.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
EDWARDS, J. concurs.
SHORTESS, Judge, concurring.
I don't agree that the trooper should have been permitted to give his opinion, but it was harmless error.
NOTES
[1] As indicated by the answers filed herein, the proper name of the defendant referred to as Preferred Mutual Insurance Company is Preferred Risk Mutual Insurance Company, and the proper name of the defendant referred to as State Farm Insurance Company is State Farm Mutual Automobile Insurance Company.
[2] Directly after the accident, Garon gave a similar statement in writing to the police.
[3] We are aware of our statements on this issue in Starks v. Kelly, 435 So.2d 552 (La.App. 1st Cir.1983). However, we note that our decision in Starks was rendered prior to the effective date of the Louisiana Code of Evidence.
[4] Preferred Risk argues in its brief that we are controlled by a manifest error standard of review on this issue. We disagree. In this case, the facts which would establish Dixon's relationship with Faith and Truth are not in dispute. Instead, the issue is whether under the facts established herein, the trial court properly concluded that Faith and Truth would not be held vicariously liable for Dixon's negligence. Accordingly, the doctrine of manifest error, which applies to the trial court's findings on questions of fact, does not apply. See Shepherd v. City of Baton Rouge/Parish of East Baton Rouge, 588 So.2d 1210, 1212 n. 3 (La.App. 1st Cir.1991).
[5] In its decision, the Fourth Circuit reversed the trial court and remanded for a new trial. The Supreme Court reversed this ruling and remanded to the Fourth Circuit, holding that the court of appeal was to decide the case on the record before it rather than remanding for a new trial. Thus, the Supreme Court's decision was not a rejection of the precepts of law in the court of appeal's decision.
[6] As stated in Ermert, 559 So.2d at 476, "[O]ur jurisprudence has drawn freely from the common law in applying the general code principles to concrete master-servant problems."
[7] If the facts presented in this case do not support a finding of vicarious liability, then we find it difficult to imagine a situation wherein vicarious liability could be imposed on a charitable organization for the acts of its volunteer. The effect of this conclusion would be to reinstate the doctrine of charitable immunity, contrary to the Supreme Court's dictates in Garlington, 289 So.2d at 93.
[8] As recognized in Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 347 (La.1992), the prevailing meaning of the term "borrow" in the context of automobile lending requires that the borrower acquire substantial possession, dominion, control, or the right to direct the use of the vehicle, and not merely that the use of the vehicle by another person was for the benefit of a purported borrower.
[9] Plaintiffs also cite Tesvich v. 3-A's Towing Co., 547 So.2d 1106 (La.App. 4th Cir.), writs denied, 552 So.2d 383, 384 (La.1989) in support of their argument that the claim of each plaintiff constitutes a separate occurrence. However, the decision in Tesvich does not set forth the policy language at issue therein.