# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-160


**SHAUNA RAYBURN, INDIVIDUALLY AND
ON BEHALF OF MORDECAI RAYBURN**

**VERSUS**

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-2717
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, John E. Conery, and Charles G. Fitzgerald, Judges.


**AFFIRMED.**

**James A. Blanco**
**Mitchell & Blanco, LLC**
**1607 Ryan Street**
**Lake Charles, LA 70601**
**(337) 436-8686**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **State Farm Mutual Automobile Insurance Company**
    **Natasha Hurts**
    **LA Imaging Services, LLC**

**Gregory P. Marceaux**
**Marceaux Law Firm**
**2901 Hodges Street**
**Lake Charles, LA 70601**
**(337) 310-2233**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Shauna Rayburn**
    **Shauna Rayburn, o/b/o Mordecai Rayburn**

**GREMILLION, Judge.**

Defendants, Natasha Hurts, LA Imaging Services, LLC and State Farm Mutual Automobile Insurance Company, appeal the jury verdict in favor of the plaintiff, Shauna Rayburn, relating to injuries sustained in a motor vehicle accident. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Rayburn was injured in a motor vehicle accident that occurred on April 15, 2014, in Lake Charles, Louisiana. Hurts was traveling southbound on Lake Street in a Toyota RAV4 owned by LA Imaging, while Chad Taylor, the driver of the Nissan that Rayburn was a passenger in, was attempting to make a left turn to head west from a stop sign at the intersection of Deesport Street and Lake Street. The two vehicles collided. Rayburn sustained a perforated colon that required resecting of her colon and resulted in infections that caused her to be hospitalized for 20 days following the accident. She underwent numerous surgeries thereafter and had many hospital visits, but Rayburn also suffered from a seizure disorder that led to many additional hospital visits.

Rayburn filed suit against Chad Taylor, who was driving the vehicle she was a passenger in, and Hurts, who was in the course and scope of her employment with LA Imaging at the time. Numerous supplemental and amending petitions were filed naming various defendants; however, the only ones pertinent to this appeal, Natasha Hurts, LA Imaging Services, LLC, and State Farm Mutual Automobile Insurance Company will be collectively referred to as the State Farm defendants.

Following a four-day trial in December 2019, the jury found Taylor 50% at fault, Hurts 30% at fault, and LA Imaging 20% at fault. The jury awarded Rayburn $2,500,000.00 for future medical expenses. State Farm now appeals and assigns as error:

1. The trial court erred in permitting introduction of the diagram of a non-testifying investigating officer which diagram constituted inadmissible opinion testimony[.]

2. The trial court erred in permitting introduction of a handwritten statement of Allison Sturlese when the witness was not available at trial and where the issues addressed by that statement was available through other witnesses[.]

3. The trial court erred in preventing appellants from introducing evidence that Holiday Inn, the alleged employer of the dismissed co-defendant, Chad Taylor, was sued and settled the Rayburn claims[.]

4. The jury erred in assessing only 50% comparative fault on the motorist who left the safety of a stop sign and entered onto the roadway in the immediate path of a favored motorist[.]

5. The jury erred in awarding speculative future medical expenses based on testimony of a physician unfamiliar with past frequency of care and without presentation of evidence discounting the current value projected costs of significant medical charges[.]

## LAW AND DISCUSSION

### Evidence

Assignments of error one through three all relate to the trial court's admission or denial of various pieces of evidence. The trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal unless it has abused that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97), 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98), 709 So.2d 706. If the trial court has abused its discretion and the jury's verdict is tainted, we conduct a de novo review. *McLean v. Hunter*, 495 So.2d 1298 (La.1986). Prejudicial errors materially affect the outcome of the trial and deprive a party of their rights. *Evans v. Lungrin*, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731. In determining if the error has substantially affected the outcome of the case we look to the record as a whole. *Wallace v. Upjohn Co.*, 535 So.2d 1110 (La.App. 1 Cir. 1988), *writ denied*, 539 So.2d 630 (La.1989).

2

*Accident Diagram*

State Farm argues that the diagram prepared by Fletcher Idom,[1] a Lake Charles City Police Officer, should not have been admitted into evidence because Idom is not an expert qualified to state the position of the vehicles at impact, and he was unable to be cross-examined at trial. State Farm notes that the trial court rejected its argument that if this report was to be admitted into evidence, the full accident report should be admitted into evidence. State Farm argues that the diagram amounted to an opinion of a non-testifying witness on an important component of the case, i.e., the comparative fault of the parties based on the location of the vehicles.

By the time of the trial, Fletcher Idom, the officer who was at the scene of the accident, had retired. Shaun Touchet testified that he is a sergeant in the Traffic Division of the Lake Charles Police Department and that he investigates motor vehicle accidents. At the time of trial, he had worked for the Lake Charles Police Department for 16 years.

Sergeant Touchet reviewed Sergeant Idom's accident scene report. Four witnesses gave statements at the scene, including Allison Sturlese, Ivo Richardson, Natasha Hurts, and Chad Taylor. Sergeant Touchet testified that Idom also prepared a not-to-scale sketch of the accident scene. While Sergeant Touchet is qualified in accident reconstruction, he was unsure if Idom was similarly qualified. Sergeant Touchet testified that indicating the debris field on the sketch is helpful in determining the ways in which the vehicles collided but that Idom had not done so. Also, no photos were taken of the scene, which Officer Touchet said is typically

---

[1] State Farm in brief refers to the officer as "Isom Guillory." We are unsure of how State Farm came up with this name. Sergeant Touchet testified that the retired officer who investigated the accident scene was named Fletcher Idom. At trial State Farm's counsel referred to Idom as "Officer Fletcher," and Touchet corrected counsel stating that his last name was Idom and his first name was Fletcher. Regardless, there is only one accident scene diagram created by an officer on the day of the accident and that is the one in question in the assignment of error.

done in cases of serious bodily injury or a fatal crash. Both parties had experts in accident reconstruction testify. State Farm states that Rayburn's expert relied on Idom's diagram at least four times in his testimony.

Opinion testimony of a non-expert is limited to opinions "1) Rationally based on the perception of the witness; and 2) Helpful to a clear understanding of his testimony or the determination of a fact in issue." La.Code. Evid. art. 701. A police officer's opinion testimony is admissible if based on his rational perception of an accident scene. *Whetstone v. Dixon*, 616 So.2d 764 (La.App. 1 Cir.), *writs denied*, 623 So.2d 1333 (La.1993).

The fact that Idom was unavailable to testify is akin to a testifying officer who has no independent recollection of the scene other than what he described in the accident report. Sergeant Touchet authenticated the document and testified as to measures he would have done differently that would aid in reconstructing the accident had he been the investigating officer, i.e., notating a debris field and taking pictures. The jury was able to consider these factors in its analysis of the accuracy of the diagram. Moreover, even if it had been improperly admitted, in an examination of the record and testimony as a whole, we find this single piece of evidence would not have materially affected the outcome of the trial. The jurors' assessment of 50% fault to Taylor and 50% to Hurts/LA Imaging belies the argument that the document was overly persuasive in favor of Taylor.

*Allison Sturlese Statement*

Next, State Farm argues that the handwritten statement of Allison Sturlese, which was attached to the police report, was improperly admitted into evidence.[2] State Farm argues that was erroneous under La.Code Evid. art. 804(B)(6) because

---

[2] The statement is reproduced below in the section addressing fault allocation.

4

Sturlese did not testify at trial, and she gave inconsistent statements regarding the accident. Again, State Farm argues that Rayburn's expert referred to Sturlese's statement numerous times.

Louisiana Code of Evidence Article 804(B)(6) addresses the admissibility of statements made by unavailable witnesses:

> In a civil case, a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy, and the proponent of the evidence has adduced or made a reasonable effort to adduce all other admissible evidence to establish the fact to which the proffered statement relates and the proponent of the statement makes known in writing to the adverse party and to the court his intention to offer the statement and the particulars of it, including the name and address of the declarant, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it. If, under the circumstances of a particular case, giving of this notice was not practicable or failure to give notice is found by the court to have been excusable, the court may authorize a delayed notice to be given, and in that event the opposing party is entitled to a recess, continuance, or other appropriate relief sufficient to enable him to prepare to meet the evidence.

There are three prongs that must be satisfied in order for the written statement of an unavailable witness to be admitted: 1) the statement must be trustworthy, 2) the party seeking admission of the statement has made a reasonable effort to produce other admissible evidence establishing the same facts, and 3) the proponent must give notice to the opposing party of his intent to introduce the statement. *Cross v. Lake Area Rehab. Serv., Inc.* 00-0224 (La.App. 3 Cir. 10/11/00), 771 So.2d 768.

Sturlese's statement was trustworthy because it was taken by the investigating officer at the time of the accident, she had no connection to any of the parties to the case, and it corroborated the statement of the person who was with her at the time. The credibility of the Sturlese/Richardson statements could be weighed by the jury based on the facts surrounding Richardson's location at the time of trial (i.e., jail), Sturlese's status as unable to be located, and the quality of the written statements

themselves. State Farm's own assignment of error mentions that the testimony of Sturlese was repetitive of Richardson's. Both Sturlese and Richardson stated that Hurts had her head down and could not have avoided the accident because she did not look up in time. Yet, the jury still assessed 50% fault to Taylor.

Rayburn's counsel went to great lengths to locate Sturlese ahead of trial, even hiring a private investigator. Rayburn filed a Notice of Intent to Use Written Statements in July 2017 relating to the statement of Allison Sturlese. While it is true that the second prong would appear to exclude Sturlese's statement because of Richardson's testimony, we find the trial court did not commit prejudicial error in allowing the brief statement of Sturlese to be admitted into evidence, and the exclusion of Sturlese's statement would have made no difference in the outcome of the trial.

*Rayburn's pre-trial settlement with Taylor's employer*

Finally, State Farm argues that the trial court erred in excluding testimony regarding Rayburn's pre-trial settlement with Taylor's employer, Holiday Inn, prejudicing it because the jury was left with the impression that Rayburn could only collect from Hurts and her employer. State Farm argues this exposed it to the jury being less likely to assess a higher level of fault against Taylor because of the inference that the State Farm defendants had more assets and insurance. The settlement of claims is inadmissible to prove liability. La.Code Evid. arts. 408 and 413. State Farm cites no jurisprudence in support of this argument. Moreover, State Farm did elicit testimony from Taylor that he had indeed been sued by Rayburn. The exclusion of the disclosure of the settlement amount was not an abuse of discretion. The jury assessed a significant amount of fault to Taylor which is inapposite to the claims made by State Farm now. Accordingly, this assignment of error is without merit.

*Comparative Fault*

Louisiana Civil Code Article 2323 addresses the apportionment of fault amongst tortfeasors:

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined .. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

*Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967, 974 (La.1985), sets forth the guidelines for apportioning fault as follows:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

We review a jury's apportionment of fault using the manifestly erroneous or clearly wrong standard of review. *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408 (La. 3/16/10), 35 So.3d 230.

State Farm argues that the jury erred in assessing only 50% of the fault to Taylor because Taylor had a greater duty as the left-turning motorist and Hurts was the favored motorist. State Farm goes into detail regarding the duties of left-turning motorists and the evidence adduced at trial. State Farm argues that Taylor should have been assessed at least 80% of the fault. We disagree.

*Chad Taylor*

Taylor testified that as he approached Lake Street from Deesport Street, he looked to the left and then to the right and then left again. He saw the Toyota SUV driven by Hurts first near the Holiday Inn when he first looked left and then the second time near the entrance of Suffolk Manor. Taylor said the Toyota SUV was first in the lane closest to the sidewalk but then veered into the inside lane. Taylor testified that he had plenty of time to turn and that if the SUV had stayed in the lane closest to the sidewalk it would not have hit him. He did state that nothing about the speed or operation of the SUV caused him any concern and he proceeded with his left-turn maneuver.

*Natasha Hurts*

Natasha Hurts testified that she has a bachelor's degree in radiologic technology, and that she worked for LA Imaging for about a year before the accident occurred. She testified that she primarily went to nursing homes and took x-rays with a mobile x-ray machine. She would then return to the vehicle and upload the image to the computer in the car. If she was satisfied with the picture obtained, she would then transmit the x-ray to the radiologist. She would transmit the images from her laptop via a company cellular Wi-Fi hotspot. Hurts testified that she would receive texts letting her know the location of the next patient and she would confirm receipt of the patient locations via a text to her employer.

Leading up to the accident, Hurts testified that she read a message from a friend while stopped at the red light. She had sent a text message to the friend while still in the parking lot at her previous assignment. Hurts said at the red light, she turned left onto Lake Street and was in the right-hand lane closest to the sidewalk. Hurts said her next destination required traveling down Lake Street and turning right onto McNeese Street. She testified that as she was heading down Lake Street, she

8

did not see any car coming and that a car hit her. Hurts said, "it came out of nowhere because I didn't see it coming." Hurts testified that she never left the right lane of travel and that the accident occurred at the intersection of Deesport and Lake Street. Hurts said it is possible she still had a phone in her hand from reading the text message, but she was not talking on the phone or sending a text. Hurts testified that she did not remember attending any safety training at her place of employment regarding cell phone usage in the company vehicle.

*Ivo Richardson*

Richardson's deposition was read into the record due to the fact that he was incarcerated at the David Wade Correctional Center. Richardson was standing at the corner of Lake Street and Deesport Street with his girlfriend, Allison Sturlese. Taylor's vehicle was directly in front of him at the stop sign. Richardson testified that he noticed Hurts' SUV because she had her head down:

> When she looked up she took—the took the phone up with her because she was already swerving into the right lane [the right lane from his point of view or the lane furthest from the sidewalk]. The white car [Taylor] had already made it to pull out. So, I guess, trying to avoid it she went to swerve back into the left lane [lane closest to the sidewalk] but it was either hit – hit it in the front or hit it in the back. I mean, by the time she was too close to avoid it.
>
> . . .
>
> Either she was reading something on her phone or texting something on her phone, I mean, I can't be sure but I know she had her phone in her hand because when she looked up, she picked up her phone also.

Richardson opined that the accident was unavoidable at the time Hurts looked up and that even if she had hit her brakes, which she did not, Hurts still would have hit Taylor's vehicle. Richardson reviewed the statement he gave to police on the day of the accident which was the same as what he stated in his deposition.

Alisson Sturlese, Richardson's girlfriend at the time, gave a witness statement on the day of the accident that was published to the jury and read as follows:

> Me and my feince [sic] (Ivo) was [sic] walking on Lake St. and Deesport St. We see silver SUV speeding on Lake St. with her head down. The white car was making left turn when the SUV change to other lane and struck white car.

*Rodney Baronet*

Baronet, the CEO of LA Imaging for fifteen years, testified that LA Imaging provides mobile x-rays. A vehicle is assigned to an x-ray tech who travels to sites to perform x-rays. Dispatchers in the Alexandria, Louisiana office send out work assignments via text as they receive them throughout the day. Baronet said that employees are expected to acknowledge receipt of the work assignments they receive via text. Baronet testified that Hurts was operating an X-ray tech car, which has the back seat removed for equipment and the passenger seat removed where the scanner and laptop are placed.

*Michael Rachal*

Rachal testified that he works for the Calcasieu Parish Communication District 911. His predecessor answered the 911 call pertaining to the accident, which was recorded. This first call came in at 11:12 a.m., the second at 11:13 a.m. In sum, there were six calls made relating to the subject accident, with the last one coming in at 11:16 a.m.

*Mike Gillen*

Gillen, an expert accident reconstructionist, testified he had been investigating traffic accidents since 1977. He worked for the Baton Rouge City Police Department and before he retired created the Traffic Homicide Unit, which was responsible for on-scene investigation of all traffic fatalities and critical injury accidents. Each member completed over 300 hours of specialized courses in technical accident reconstruction. Gillen said he had been in private practice since 1993, had testified

in about 400 cases, and handled over 2,000 accident reconstructions in the private sector.

Gillen stated that he was hired to retrieve the minicomputer located in the air bags of the Toyota RAV4 driven by Hurts, which provides an assortment of information about the vehicle in order to determine if an airbag needs to be fired. The crash data retrieval (CDR) system provides information as to whether a seatbelt was fastened, the speed of the vehicle, the engine RPMs, whether and to what extent the accelerator pedal was applied, and whether the brakes were applied.

Gillen then discussed an aerial analysis he created showing his determination of the location of the vehicles. He determined from the CDR information that Hurts' vehicle was traveling at a constant 41 or 42 miles per hour in the 4.1 seconds leading up to the accident, and that she never depressed her brakes because there is no change in RPMs. Gillen described the timing of the acceleration of the Hurts' vehicle (Toyota) and concluded that there was a 3.7 second window of opportunity in which Hurts could have seen the Nissan approaching, yet she never braked. After reviewing technical information about speed and distances, Gillen concluded that Hurts could have stopped in time to avoid the accident if she had been looking at what was in front of her.

Gillen then reviewed Hurts' cell phone records. She had two phones: one for personal use and one for work. Gillen noted an outbound data transfer on the company phone at 11:00 a.m. and at 11:06 an outbound text on the company phone. At 11:08, there was an outbound text on Hurts' personal phone. There was also a data download that began at 11:10 a.m. and ended at 11:19 a.m.

Gillen concluded that Hurts had the opportunity to avoid the collision but did not because she was unaware of what was going on in front her that was in clear view. However, he did not have access to the computer box in Taylor's car and,

11

when questioned if Taylor did anything wrong in operation of his vehicle from an accident reconstruction standpoint, Gillen replied that he also had an opportunity to brake and that he was traveling at a lower speed, which takes a lesser distance to come to a stop.

*Vernon "Dean" Tekell, Jr.*

Tekell was qualified as an expert in accident reconstruction. He concluded that the accident occurred in the right southbound lane on Lake Street (the lane closest to the sidewalk) and the angle at impact was at or near ninety degrees. Tekell gave a lengthy technical testimony as to his reasoning for this finding. Regarding his findings as compared to Gillen's he stated:

> He [Gillen] said he wasn't sure if it happened in the right lane or left lane. It happened in the right lane.
>
> He [Gillen] says, Ms. Hurts was unaware of what was going on in front of her. And he derives that – that was one of his conclusions. And he derives that conclusion because he starts the clock when the vehicle leaves the stop line [the Taylor vehicle]. If you start the clock when the vehicle enters the lane, you would have to conclude that an alert driver would not be able to respond in time to the vehicle entering her lane of travel.
>
> He [Gillen] said, This crash didn't have to happen. And, I agree. If Taylor had used his 1.9 seconds before he entered the road, he would have seen her in close proximity and he would not have pulled out in front of her and this crash wouldn't have happened.

Tekell opined that Hurts did not have enough time to stop, but Taylor did. Gillen and Tekell differed in their opinions on when perception reaction starts and the location of the collision (left or right lane southbound on Lake Street). Gillen testified Hurts could have stopped; Tekell testified that she could not have stopped because she was in the right hand lane.

The jury was given all of the well-established law relating to the duties of the favored motorist and the heightened burden of the left-turning motorist. The experts gave very detailed scenarios relating to the distance, speed, perception, and reaction

12

time of the parties. There was no definitive evidence conclusively determining that Taylor was significantly more at fault than Hurts. The jury found both parties nearly equally at fault in causing the accident. It is reasonable to conclude that Hurts looked down briefly at approximately the same time Taylor proceeded from the stop sign to make his left turn and the collision occurred. Perhaps Taylor should not have departed from the stop sign when he did, but it is also plausible that Hurts could have stopped in time if she had been paying attention. The fact that she did not depress her brakes, according to the CDR information, is strongly indicative that the favored motorist was significantly negligent in causing this accident. The jury's fault allocation is not manifestly erroneous. Based on the evidence in the record, reasonable jurors could allocate fault in the manner in which it did. Accordingly, we find this assignment of error without merit.

***Future Medical Expenses***

A panel of this court recently summarized the law applicable to awards of future medical expenses:

> A Plaintiff must prove that "future medical expenses will more probably than not be incurred." *Menard v. Lafayette Ins. Co.*, 09-1869, p. 12 (La. 3/16/10), 31 So.3d 996, 1006. "A plaintiff shows the probability of future medical expenses with supporting medical testimony and estimations of their probable cost." *Id*. "Importantly, future medical expenses must be established with some degree of certainty." *Id.* A court should not reject an award of future medical expenses when an exact value of such expenses is not offered if the record does establish that future medical expenses are necessary and inevitable. *Id*. The plaintiff can establish entitlement to a minimum amount of future medical expenses that reasonable persons could agree would be required through evidence of past medical expenses and other additional evidence. *Id*.

> A plaintiff must establish by a preponderance of the evidence that future medical expenses will be medically necessary. *Id*. An award of future medical expenses is highly speculative and cannot be calculated with mathematical certainty. *Id.* Future medical expenses awards generally turn on questions of credibility and inferences of experts and witnesses. *Id*. A jury's assessment of future medical expenses is subject

to great deference on review and an appellate court should rarely disturb an award on review. *Id.*

> An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: *there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong.* This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury's fact finding conclusion was a reasonable one.

*Id.* at 1007 (citations omitted).

A jury's choice between two permissible views of the evidence cannot be manifestly erroneous or clearly wrong. *Id.*

*Fontenot v. UV Ins. Risk Retention Grp., Inc.*, 20-361, 20-362, pp. 18-19 (La.App. 3 Cir. 4/14/21), __ So.3d __, __, *writ denied*, 21-656 (La. 10/05/21), __ So.3d __.

In this assignment of error, State Farm argues that reliance on the testimony of Dr. Richard Shimer, who stated that Rayburn would have $50,000.00 to $100,000.00 per year in medical expenses and who performed some of the later surgeries on Rayburn, was misplaced because his estimated future care costs was not based on any currently scheduled care or procedures and that the frequency of care (six to seven hospital visits per year) had not occurred in years. Moreover, State Farm argues some of those visits were related to Rayburn's seizure disorder and not the accident. State Farm further points out that Rayburn's last hospital stay was more than one year before trial. State Farm points to Dr. Shimer's testimony at trial that, "I think there are probably better people than me to get an accurate number going forward." Further, State Farm argues that there was no testimony about life expectancy, nor any testimony by an economic loss expert. State Farm argues that Dr. Shimer's estimation of future medical care was based on speculation and nothing

14

else. It concludes that the highest amount which could be awarded under the facts is $280,000.00. We note that State Farm did not provide any evidence regarding future medical expenses. The following testimonial evidence was introduced regarding Rayburn's medical care since the accident.

*Shauna Rayburn*

Rayburn was 34 years old at the time of the trial and had one child. She testified that she has had epilepsy since she was thirteen years old. Rayburn had no recollection of the accident, only waking up in the emergency room. Rayburn described her long recovery from injuries following the accident. She was initially in the hospital for two to three weeks because her colon had to be resected. She subsequently developed methicillin-resistant Staphylococcus aureus (MRSA). She was discharged home with drainage pumps and a wound vac. She described the pain as if someone was constantly stabbing her. Rayburn had numerous surgeries due to infections and a surgical hernia that occurred subsequent to the surgeries. Rayburn said she had constant pain in her stomach and could not even walk.

In 2017, Rayburn had another surgery and was in the hospital for more than a month. Numerous photographs were introduced into evidence showing Rayburn's stomach cut open and packed with gauze. Her navel has been completely removed due to all of the surgeries, and she has significant scarring. The last surgery Rayburn had on her stomach was in June 2018 at Memorial Hermann Hospital in Houston, Texas. She had seen her current doctor, Dr. Shimer, twice over the summer prior to trial, but he did not do any procedures or recommend that she have any procedures.

*Dr. Thomas Strong*

Dr. Thomas Strong, a board-certified general surgeon testified via video deposition. He was the on-call surgeon working when Rayburn was brought into the emergency room following the accident. A CT scan revealed an abdominal injury

that was bleeding and a perforation because of air visible outside the bowel on the scan. Rayburn was taken to surgery where it was discovered that she had a laceration of the colon. Pus and feces were leaking from the laceration into the abdomen, which is normally a sterile environment. Rayburn required emergency surgery. Dr. Strong removed a portion of the colon and cleaned all of the material out. Her wound was packed and left open because of the high risk of infection. Dr. Strong said the dressing would be changed daily and once it started looking healthy, he would go back to surgery and close the rest of the incision.

A wound vac was placed in the incision. On April 21, 2014, Rayburn was taken back to surgery, the wound vac was removed, the wound was cleaned, and the incision was closed. However, Rayburn developed another infection, so the wound was reopened and the wound vac placed again. MRSA developed. Rayburn was treated with antibiotics. Her initial stay in the hospital was from April 15, 2014, thru May 5, 2014. Rayburn was discharged to home health care to replace the dressing and the wound vac three times per week. By August 25, 2014, Rayburn was still complaining of pain and it was determined that she had a surgical hernia. Rayburn underwent surgery for the hernia on September 10, 2014, and was discharged two days later. She returned on September 25, 2014, with another wound infection requiring surgery. Another surgery was performed on September 29, 2014, to evaluate the wound and place another wound vac device. An identical surgery was conducted on October 1, 2014, to assess the wound and clean it out and place a wound vac device.

On March 20, 2015, Rayburn had an outpatient surgical procedure for a stitch abscess problem. On November 20, 2015, Rayburn was admitted to the hospital with nausea, vomiting, and stomach pain related to cellulitis and a pocket of fluid collected near the wound. Dr. Strong testified that chronic wound issues can develop

16

when the area has not completely healed.  On November 24, 2015, Dr. Strong reopened the wound to remove infected stitches and cleaned up the fluid collection. Dr. Strong testified that Rayburn's injuries were life-threatening and painful.  Dr. Strong said that all of the medical treatment he rendered to Rayburn was caused by the accident.

*Dr. Richard Shimer*

Dr. Shimer, a board-certified surgeon since 2002, was tendered as an expert in general surgery.  He reviewed Rayburn's surgeries leading up to the surgery he performed on February 9, 2017.  He testified:

> This is an operation that would give pause to any surgeon.  A patient that's had this set of problems, multiple surgeries on the abdominal wall. So, it was quite risky getting into this.  But we really had no alternative. This was the save linked to her – her life.  Our goal was to get in there and remove, cut out, this infection on her abdominal wall and including whatever loops of intestine were involved in this.

Dr. Shimer removed part of Rayburn's abdominal wall, a fistula and abscess, and a portion of her small intestine.  Additional procedures were performed on February 21, 27, and March 8, 2017, to remove additional infection that had spread to her small intestine.  Dr. Shimer released Rayburn on March 23, 2017, to home health care to change the wound vac three times per week.

On June 30, 2017, Rayburn returned to the hospital and had a debridement procedure on July 3, 2017, to remove non-viable tissue.  The wound was cleaned. Rayburn was released from the hospital on July 5, 2017.  She continued with home health care through September 2017.

Rayburn suffered a Mallory-Weiss tear from vomiting, which is a tear in the esophagus.  Just a few months prior to trial, Dr. Shimer testified that Rayburn was still having a foul discharge from a portion of her scar tissue on her abdominal wall. Rayburn has had a total of twenty-six CT scans, which Dr. Shimer said increases her

risk for malignancies later in life, something he is concerned about. When questioned about her future prognosis, Dr. Shimer testified he would expect that the wound issues would need to be addressed for "a long duration." Regarding future medical expenses, Dr. Shimer opined that $50,000-$100,000 per year in medical bills was a conservative estimate assuming she "doesn't encounter any other significant problem and intestinal malignancy, a small bowel obstruction that requires surgical intervention, a complicated pregnancy, or any of those types of problems." Dr. Shimer stated that the $50,000 to $100,000 estimate was a best-case-scenario, conservative estimate. Assuming she lived to age 74, Dr. Shimer estimated Rayburn would incur $2,000,000 to $4,000,000 million in future medical expenses.

Dr. Shimer testified to the significant emotional impact having a chronic infection of her abdominal wall for several years would have on a twenty-eight-year-old woman. He said that the chronic physical condition of her abdominal wall would lead to chronic discomfort. Dr. Shimer opined that she would probably experience chronic discomfort. He testified that, without question, the accident was the cause of the injury and repeated infections and future medical expenses.

Dr. Shimer's most recent visit with Rayburn was August 6, 2019, during which he unroofed a skin bridge on a portion of her scar that was causing continued foul odors and low-grade infection. However, he said he did not have any procedures scheduled for Rayburn. On cross-examination Dr. Shimer was questioned:

> Q. So right now, when you're giving conservative estimates about future care, it's not based on any knowledge of any current scheduled, or needed, medical procedures?
>
> A. Based on the history of where she had come from, and then the decline in the need for care since we had taken care of her, those – looking at that distance behind and that distance forward, yeah, that's why we kind of came up with that estimate.

Q. And in coming up with that estimate, were you actually using dollars and cents figures regarding –

A. Yes.

Q. – past medical bills?

A. Knowing how much a hospital charges, for instance, for a CAT Scan, or an ER visit, and then knowing the volume of – and that's just for that. That wasn't even looking at the procedures that she has undergone or any other ancillary type of testing. That was just straight up for ER visits and CAT Scans.

Q. And, in order to get $50,000 of charges for ER visits and CAT Scans, how many – on a yearly basis, how many ER visits or CAT Scans would you be estimating?

A. Well, currently – currently the hospital charge for a simple CAT scan is nearly $5,000. ER visit by an ER physician is several thousand dollars. So, $7,000 for a visit, six or seven visits per year, which is less than she had been going through previously, that's going to come up to about that – that number is just for professional and CT charges.

When questioned about the reduction in charges in the previous year compared to the years before, Dr. Shimer stated:

A. Well, of course, there will be a range. One year is not going to be completely consistent with the year before or the year – the year after. My hope would be that her over all expenses will be less than when we had started with her. But, I – I have – we have a limited set of data points in front of us to predict for something for ten years or twenty years down the road. That's kind of giving a best estimate. I don't think it's going to be insignificant. I think she's going to be having medical bills in the neighborhood of probably 50 to $100,000 per year.

Moreover, Dr. Shimer testified that he did not even take into account the past surgeries in formulating his estimate. Regarding his comment that there "are probably better people than me to get an accurate number going forward," Dr. Shimer went on to state:

But, I'm just giving my best estimate as a surgeon who is taking care of her. Knowing how many—about – contacts she's had, how many CAT scans, how much medical care she's been requiring to give a considerable – a decent guess on what her charges are going forward.

Q. And, going back to the frequency of the past medical care and what you've seen, did you personally segregate review of any medical

19

records that had emergency room visits for infections and emergency room visits for seizure disorder and the like?

A. Yeah. It – it – to me it looked like it was fairly balanced between issues with her abdominal wall. But also with issues with her seizure disorder. But, again, like I had testified earlier, this person was suffering from a chronic infection, a low grade sepsis of her abdominal. And that's gonna cause problems with management of her seizure disorder. So, I would say that – I believe a lot of those visits for seizure disorder over that time period were related to her having problems with her abdominal wall infection.

He reiterated that he believed that was a conservative estimate and that his estimates did not include any surgeries.

We find no error in the jury's award of $2,500,000 for future medical expenses. While State Farm heavily relies on the decreased visits in the past year leading up to trial, it is impossible to predict with what frequency in the future Rayburn will have issues relating to her multiple surgeries and infections. State Farm cross-examined Dr. Shimer, yet the jury found his estimate credible. We cannot say that it was manifestly erroneous in doing so. A reasonable jury could conclude that $2,500,000 in medical expenses over the course of Rayburn's life is a conservative estimate. Accordingly, this assignment of error is without merit.

## CONCLUSION

The judgment of the trial court awarding the plaintiff-appellee, Shauna Rayburn, $2,500,000 in future medical expenses is affirmed. The allocation of fault by the jury is affirmed. All costs of this appeal are assessed against the defendants-appellants, Natasha Hurts, LA Imaging Services, LLC, and State Farm Mutual Automobile Insurance Company.

**AFFIRMED**.

20